

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 2-09-062-CV

CHRISTOPHER O'DELL AND                                    APPELLANTS
ARLINGTON STEAKHOUSE, INC.

V.

REBECCA WRIGHT                                               APPELLEE

------------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### I. INTRODUCTION

Appellee Rebecca Wright ("Wright") sued Appellants Christopher O'Dell and Arlington Steakhouse, Inc. ("O'Dell") for sexual harassment, assault and battery, and constructive discharge. A jury found in favor of Wright, awarding a total of $425,000 in past mental anguish damages based on its findings of sexual harassment and assault. In four issues, O'Dell argues that the trial court erred by not allowing O'Dell to call a witness; that the trial court erred by allowing Wright to testify about being

abducted and sexually assaulted when she was five years old; that the trial court erred by not applying a statutory cap to the sexual harassment damages; and that the evidence is legally and factually insufficient to support both the jury's mental anguish finding and the amount of damages awarded. We will affirm.

## II. BACKGROUND

Wright worked as a waitress at Arlington Steakhouse, a restaurant in Arlington, Texas, from July 2004 to October 2004. By all accounts, after O'Dell had verbally reprimanded Wright for serving a dessert not available on the menu to a long-time customer of the restaurant, Wright quit and walked out. Shortly thereafter, Wright filed a complaint against O'Dell with the Texas Workforce Commission—alleging sexual harassment. After receiving a right-to-sue notice, Wright filed this present lawsuit.

According to Wright's testimony at trial, O'Dell—Wright's supervisor and a stockholder in Arlington Steakhouse—made numerous lewd and sexually suggestive comments to her, touched her multiple times in a sexually offensive way, and created a sexually harassing environment for her and other female waitstaff at the restaurant. Wright said that on one occasion, as she was taking a break, O'Dell stuck his finger down the back of her pants. On another occasion, O'Dell took his finger and "stuck it down [the front of her] shirt." Wright said that both times she told O'Dell not to do such things, but he "smirked and walked off." Wright alleged that O'Dell had also once stuck his tongue in her ear as she was entering orders in the

2

restaurant's computer. Wright said that O'Dell also brushed his body up next to hers, so much so that she could feel his "private part" pressed against her body. Wright testified that these events made her feel "[v]ery gross, very dirty," and "very angry." Wright said that each time O'Dell would do these types of things, she told him to stop.

Wright also testified to a number of comments O'Dell made to her during her employment at the restaurant. Wright said that at the end of her shift, she would report to O'Dell so that he could make sure her stations were in order. Wright said that O'Dell would frequently look her "up and down" and make sexually-connoting comments like, "[L]ooks good to me." She said that he would also make comments about how her bottom looked good in her pants, how she smelled good, or that her breasts looked good in certain shirts. Wright said that O'Dell also made even more advancing comments. She said that O'Dell once propositioned her to go upstairs and perform oral sex for $20. On another occasion, O'Dell allegedly spoke about how his fingers were "double jointed" and asked Wright to "imagine what I can do." Wright said that O'Dell's comments were clearly sexual in nature. He allegedly also propositioned Wright to have a "threesome" with O'Dell and his wife and once invited Wright over for a nude swim in his pool. Wright said that O'Dell's alleged conduct was typical of him and that he had done these types of things to other waitresses. Wright's attorney introduced a portion of a petition by one of Wright's co-workers who had also filed a similar suit against O'Dell.

3

Wright testified that O'Dell would also degrade her by calling her a "F-ing whore, F-ing bitch, stupid waitress, [and] stupid whore." Wright said that all of these comments and conduct by O'Dell made her feel "very low . . . just violated." Wright said that she did not quit when these events occurred because she needed the job, was intimidated by O'Dell because he was her superior, and wondered if others would believe her account of these events. She also said that she felt "helpless" to leave and that somehow maybe she "deserved" what she was being exposed to.

During direct examination, Wright's attorney asked her if she had ever in the past felt similar feelings that others would not believe her. As Wright began to answer, the following colloquy took place:

> [Wright's attorney]: Have you ever felt like that before?
>
> [Wright]: Yeah.
>
> [Wright's attorney]: Would you tell the jury about it?
>
> [Wright]: When I was 5 years old I was outside my mother's - -
>
> [O'Dell's attorney]: Objection, Your Honor. Relevance on this case.
>
> [Trial Judge]: Approach the bench, please.
> (Bench conference without court reporter.)
>
> [Wright's attorney]: I'm sorry about the interruption. Would you just tell us what happened, briefly?
>
> [Wright]: When I was 5 years old, I was riding my bicycle out in front of my mother's apartment. I was supposed to have a babysitter watching me.

4

[Wright's attorney]: Slow down. You're talking very fast. I don't want you to have to do it twice.

[Wright]: When I was 5 years old, I was riding my bike in front of my mother's apartment. My babysitter was supposed to be watching me, and she wasn't. A guy in a truck pulled up and asked me if I had ever seen a dog. I stopped my bike and answered him. And at that time he grabbed me and threw me in his truck and made me lay down, and drove me to some apartments about an hour away. And there was this field across from the apartment (Crying), and made me perform oral sex on him. And then he pulled my shirt over my head and he left. And I had to walk across the apartments and find somebody to help me.

[Wright's attorney]: And that was when you were five?

[Wright]: Yes.

[Wright's attorney]: Was that your first bad experience with a male?

[Wright]: Yes.

O'Dell's attorney made no further objections to this testimony, other than the one preceding the bench conference; and later, during cross-examination, he exchanged in the following colloquy with Wright about the same matter:

[O'Dell's attorney]: Sure. And -- now, you came up with -- I understand three days ago you told your attorneys about being abducted when you were five years old?

[Wright]: Yes.

[O'Dell's attorney]: And certainly if that occurred, I think everybody in this room would be sympathetic to you. But obviously when something pops up just before the day of trial that's that important, I have to question it. Is there any reason why you didn't bring it to your attorneys' attention earlier?

5

[Wright]: It's just something that I needed to talk about.

[O'Dell's attorney]: Were there any witnesses to that event? Are there any witnesses to . . . you being abducted?

[Wright]: No.

[O'Dell's attorney]: Any police reports you have?

[Wright]: No.

[O'Dell's attorney]: Were the police even called?

[Wright]: Yes. There may be a police report.

[O'Dell's attorney]: Do you have it?

[Wright]: No.

[O'Dell's attorney]: Have you ever actually seen it?

[Wright]: No.

Wright also testified extensively as to how O'Dell's alleged actions affected her. In addition to saying that O'Dell's actions made her feel "degraded . . . violated . . . low" and distrustful of working for others, she said that she had trouble forgetting what had occurred. She said that after the events, she has since interviewed for jobs and wonders whether her potential new bosses will treat her the same.

Wright said that she has nightmares regarding the events. Not only does she dream about the actual events, but she also has dreams where she is running from O'Dell. She testified that she once had a dream where she dreamed "for six hours" that she was trying to save O'Dell from drowning.

6

According to Wright, she has "a tendency to clinch [her] jaw" due to the anxiety that these events caused her. She said that she often holds her breath when she talks about O'Dell or anything that "deal[s] with him." She experiences episodes of being nauseated and feels the need to vomit. Her body stiffens, her heart races, and she suffers from the "shakes." Oftentimes, because of what she suffered, she feels almost paralyzed and her blood pressure rises. She said that she cannot control when she thinks about O'Dell and that she cannot control when these side effects occur.

Wright also explained how the trial was very stressful to her and that when she had to see O'Dell in the courtroom it made her feel dirty, angry, powerless, disgusted, and scared. Wright said that she started experiencing side effects the day after she quit, that they continued even up to and through trial, and that she did not have these side effects prior to her employment at the restaurant. Wright admitted that there were other stressful things in her life, including the death of her husband (whom she was separated from at the time) in a motorcycle accident a few months after she quit the restaurant. She also admitted that she had never received medical attention nor prescription drugs to help deal with the symptoms she testified to.

Wright also called O'Dell to testify. O'Dell testified that he possessed a general understanding regarding the laws pertaining to sexual harassment but that he did not have a specific policy in place at the restaurant. He said that in the event

that anyone had a specific complaint, they were to report to him, his wife, or the assistant manager. O'Dell generally denied Wright's accusations. He testified that it would have been impossible for him to stick his finger down Wright's blouse because of the aprons that he required the waitstaff wear at the restaurant. He also said that it would have been very difficult to stick his finger in the back of Wright's pants when she was taking a break, without being seen, due to where she would have been seated during breaks. O'Dell admitted that he would lose his patience and that he would use pejorative terms sometimes, and he at first denied ever calling Wright the names that she alleged he had called her but later agreed he had called her a "bitch." He also admitted that another waitress had brought a similar suit, alleging complaints similar to those alleged by Wright, and that he had settled that suit as "a business decision." In this suit, O'Dell brought his own counterclaim for defamation against Wright.

The jury returned a verdict in favor of Wright. Specifically, the jury found that O'Dell assaulted Wright, that Wright had been constructively discharged from her employment, and that Wright was subjected to harassment based on sex. The jury found that Wright had not defamed O'Dell. The jury awarded past mental anguish damages on both the assault and sexual harassment claims. The jury did not award any future mental anguish damages. The trial court entered judgment on the jury's verdict. This appeal followed.

### III. DISCUSSION

8

**A.     The trial court's denying Martinez's testimony**

In his first issue, O'Dell argues that the trial court erred by not allowing him to call a witness—Amanda Martinez—to testify. Wright counters that O'Dell failed to identify Martinez as a witness with knowledge of material facts on his responses to Wright's discovery requests and admitted that this failure was due to inadvertence; thus, the trial court did not abuse its discretion by not allowing Martinez to testify. We agree with Wright.

A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, unless the court finds that (1) there was good cause for the failure to timely disclose or (2) the failure will not unfairly surprise or prejudice the other parties. Tex. R. Civ. P. 193.6(a). The purposes of this rule are to promote responsible assessment of settlement and prevent trial by ambush. *Tex. Mun. League Intergov'tal Risk Pool v. Burns*, 209 S.W.3d 806, 817 (Tex. App.—Fort Worth 2006, no pet.); *see also Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 913–14 (Tex. 1992) (op. on reh'g) (applying predecessor rule 215(5)). The party seeking to offer the evidence at issue has the burden to establish good cause or lack of unfair surprise or prejudice. Tex. R. Civ. P. 193.6(b). The trial court has discretion to determine whether the offering party has met its burden; however, a finding of good cause or the lack of unfair surprise or unfair prejudice must be supported by the record. *Burns*, 209 S.W.3d at 817. Inadvertence alone will not constitute good

9

cause for the failure to timely make, amend, or supplement a discovery response. *See Alvarado*, 830 S.W.2d at 915 ("If inadvertence of counsel, by itself, were good cause, the exception would swallow up the rule, for there would be few cases in which counsel would admit to making a deliberate decision not to comply with the discovery rules.").

In this case, according to O'Dell's offer of proof, O'Dell intended to ask Martinez about three things: (1) that O'Dell would not have allowed Wright to wear the apron she contends she wore while working at the steakhouse; (2) that, contrary to Wright's allegations, Martinez was never sexually harassed by O'Dell; and (3) that Martinez overheard Wright say that she would lie to get more money in this suit.

During the offer-of-proof hearing, O'Dell admitted that he knew for months about Martinez's expected testimony regarding which apron Wright would have worn and Martinez's expected denial that O'Dell made unwanted advances toward her. When questioned by the trial judge, O'Dell admitted that Martinez was his employee; that he had known about her for months; and that, despite having procured an affidavit from Martinez, her affidavit was never delivered to Wright. According to O'Dell, his failure to update disclosure including Martinez as a witness was "by mere oversight."

Furthermore, O'Dell admitted that he had intended to put on Martinez's alleged expected testimony regarding Wright's having said she would lie to prove his counterclaim for defamation against Wright and that the information was indeed a

10

surprise to both parties. We conclude that the trial court did not abuse its discretion by finding that O'Dell failed to establish his burden that there was good cause for the failure to timely disclose Martinez or prove that his failure to disclose her as a witness would not have surprised or prejudiced Wright. *See* Tex. R. Civ. P. 193.6(a). We overrule O'Dell's first issue.

### B.      Wright's testimony regarding her childhood abduction

In his second issue, O'Dell argues that the trial court erred by allowing Wright to testify about being abducted and sexually assaulted when she was five years old. O'Dell argues that he objected to this testimony at trial and that the trial court implicitly overruled his objection; thus, he is entitled to raise the issue on appeal. Wright argues that O'Dell never obtained an explicit ruling on his relevance objection; thus, he has not preserved this potential error for review. Furthermore, Wright argues that O'Dell never raised a separate objection to the testimony at issue based upon the rule providing for exclusion of relevant evidence if its probative value was substantially outweighed by danger of unfair prejudice; thus, Wright argues, to the extent that O'Dell now argues that this testimony was prejudicial, he also failed to preserve that argument for our review. Tex. R. Evid. 403.

To the extent O'Dell is arguing on appeal that Wright's testimony was prejudicial, he has failed to preserve this complaint for our review because he objected at trial only that this testimony was irrelevant and not that its probative value was outweighed by its prejudicial value. *Id.* Thus, O'Dell's argument that this

11

testimony was introduced solely to "manipulate the jury with sympathy" does not comport with his objection below and is waived. *See Tex. Dep't of Transp. v. Olson*, 980 S.W.2d 890, 897–98 (Tex. App.—Fort Worth 1998, no pet.) (holding appellant failed to preserve error as to relevancy by objecting to an expert's qualifications).

To the extent, however, that O'Dell is arguing on appeal that the testimony in question is irrelevant, it is not readily ascertainable that the trial court implicitly ruled on O'Dell's relevancy objection. *See* Tex. R. App. P. 33.1(a)(2)(A) (stating that in order to preserve an error for appeal, the trial court must have ruled on a party's objection "either expressly or implicitly"). In this case, as Wright began to answer questions about what had happened to her as a child, O'Dell objected—citing relevance. The trial judge immediately called both parties' attorneys to the bench and held a conference off the record. Afterwards, without giving a ruling—and without any other objections being raised—Wright continued to testify regarding this same subject. This court cannot conclude that this is the type of implicit ruling contemplated by rule 33.1, and we can find no authority to suggest that an implied ruling can be found under the facts of this case. *Compare Blum v. Julian*, 977 S.W.2d 819, 823–24 (Tex. App.—Fort Worth 1998, no pet.) (holding that trial court implicitly overruled plaintiff's objections to defendant's summary judgment proof when it granted defendant's motion for summary judgment), *with Dolcefino v. Randolph*, 19 S.W.3d 906, 926–27 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (holding no implicit ruling could be ascertained from the record).

12

Furthermore, O'Dell never requested a running objection regarding Wright's testimony and in fact later questioned Wright about the same evidence; thus, the general rule that error in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection would apply, and O'Dell has waived his objection to this testimony. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) (*citing Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984)); *City of Houston v. Riggins*, 568 S.W.2d 188, 190 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.).

Additionally, even assuming this potential error was preserved, we conclude that the trial court did not abuse its discretion by allowing Wright to testify to these matters. Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). Generally, evidence will be deemed to be relevant if it tends to prove or disprove any fact in issue. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360–61 (Tex. 2000). In this case, one of the issues debated between the parties was why Wright did not leave the restaurant after the first encounters that she found sexually

13

harassing.  Another issue was the extent of mental anguish that Wright had suffered because of O'Dell's alleged offensive touching and sexual harassment.  Wright testified that her fear of speaking out about what had occurred and the degree to which these events impacted her were shaped by what had happened to her when she was five years old.  Given these issues, and focusing only on whether this testimony was relevant, we cannot conclude that the trial court acted arbitrarily or unreasonably by allowing Wright to testify over O'Dell's relevance objection.  We overrule O'Dell's second issue.

## C. Evidence supporting mental anguish damages

In his third and part of his fourth issues, O'Dell challenges the legal and factual sufficiency of the evidence supporting the mental anguish awards. The jury awarded Wright $175,000 in mental anguish damages based on the jury's finding of assault and $250,000 in mental anguish damages based on the jury's finding of sexual harassment. In these issues, O'Dell attacks both the sufficiency of the evidence supporting the mental anguish finding and that the awards are unfair and unreasonable compensation.

An award of mental anguish damages will survive a legal sufficiency challenge when the plaintiff has introduced direct evidence of the nature, duration, and severity of her mental anguish, thus establishing that there was a substantial disruption in her daily routine. *Parkway Co. V. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). We apply traditional no-evidence standards to determine whether the record reveals any evidence of "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger' to support any award of damages." *Id.* (*quoting J.B. Custom Design & Bldg. v. Clawson*, 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ)). Direct evidence may be in the form of the parties' own testimony, that of third parties, or that of experts. *Parkway*, 901 S.W.2d at 444. The evidence also must justify the amount awarded. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Although the impossibility of any exact valuation requires that juries be given a measure of

15

discretion in finding damages, that discretion is limited. *Id.* A jury must find an amount that would fairly and reasonably compensate for the loss; however, juries cannot simply "pick a number and put it in the blank." *Id.*

Here, Wright testified that on many occasions she had experienced anxiety, which included clinching her jaw, holding her breath, and the sensation of feeling stiff and unable to move: "I just stand still, like I'm stuck, I'm rooted. Like almost - - it's like almost paralyzing." She said that she also experienced feelings of being nauseated and had episodes where her heart raced and her blood pressure rose. Wright testified that she experienced "shake[s]." According to Wright, she had nightmares, including dreams where she was running from O'Dell or saving him from drowning. Wright said that these symptoms began "the next day" after quitting when she discussed the events with her mother and that these side effects continued throughout the nearly four-year period leading up to trial. Wright further testified that retelling these events in preparation for trial made her feel "dirty," "angry," "disgusted," and "powerless." Wright said that when she recalls what transpired, it is as though she is experiencing the events "all over again." We conclude and hold that Wright presented legally and factually sufficient evidence of compensable mental anguish both to the assault and to the sexual harassment claims. But our inquiry does not end there because Wright also must have presented evidence to justify the amount awarded. *Saenz*, 925 S.W.2d at 614.

16

In *Saenz*, our supreme court held that there must be evidence that the amount of damages awarded by the jury for mental anguish was fair and reasonable but acknowledged that such determination is often difficult:

> There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations. *Id.*

In *Bentley v. Bunton*, our supreme court reviewed a mental anguish award of $7 million, holding that it was excessive and without support in the evidence. 94 S.W.3d 561, 607 (Tex. 2002). With regard to appellate review for evidentiary support of noneconomic damages, the Court wrote:

> Just as a jury's prerogative of assessing the credibility of evidence does not authorize it to find liability when there is no supporting evidence or no liability in the face of unimpeachable evidence, so a large amount of mental anguish damages cannot survive appellate review if there is no evidence to support it, or a small amount of damages when the evidence of larger damages is conclusive. The jury is bound by the evidence in awarding damages, just as it is bound by the law.

*Id.* at 606. Citing *Saenz*, the *Bentley* court "rejected the view that [the authority for appellate review of insufficient evidence] displaces [an appellate court's] obligation . . . to determine whether there is any evidence at all of the *amount* of damages determined by the jury." *Id.* Recognizing that reasonable compensation is not easy to determine, we conclude that there is sufficient evidence in the record to support

17

the amount of the jury's awards for mental anguish and that the amounts awarded are fair and reasonable.[1]

The jury heard testimony from Wright as to the disruption in her life and the personal toll taken by the events surrounding the assault and sexual harassment. Moreover, the jury was asked to consider an award for Wright's future mental anguish, but it awarded no damages to her on this issue. *See Schindler Elevator Corp. v. Anderson*, 78 S.W.3d 392, 415 (Tex. App.—Houston [14th Dist.] 2001, judgm't vacated w.r.m.) (reasoning that an award of some damages and not others indicates that jury "measured carefully" damages issue). From this record, it is certain that the jury did much more than "simply pick a number and put it in the blank." *See Saenz*, 925 S.W.2d at 614. We conclude and hold that the jury's awards for the assault and for the sexual harassment were fair and reasonable. We overrule O'Dell's entire third and this portion of his fourth issues.

### D.    Texas Labor Code Section 21.2585's statutory cap

In the remainder of his fourth issue, O'Dell argues that the trial court erred by entering judgment based on the jury's finding of an award in excess of Texas Labor Code Section 21.2585's statutory cap. *See* Tex. Lab. Code Ann. § 21.2585(d)

---

[1] ... In *Saenz*, our supreme court concluded that there was no evidence to support the jury's $250,000 award for mental anguish damages, considering that the only evidence found in the record was one question and one answer, which indicated that Saenz worried and that she believed she and her husband might lose their home and that they could not afford the medical bills. 925 S.W.2d at 614.

(Vernon 2006). The labor code sets the maximum damages allowable, both compensatory and punitive, dependent on the number of employees of the defendant. *See id.* The damages awarded to Wright totaled $250,000 on the sexual harassment claim. An award of this amount would require the defendant to employ at least 500 persons. *See id.* O'Dell argues that because his steakhouse employed fewer than 100 employees, the mental anguish damages for Wright's sexual harassment claim should have been capped at $50,000. *Id.*

In this case, O'Dell admits that he never pleaded the damages cap. As a general rule, where maximum damages are provided in statutes in Texas, and a defendant wants to rely on the cap, it is considered a defense that must be pleaded and proved. Tex. R. Civ. P. 94; *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896–97, 904–905 (Tex. 2000); *see, e.g.*, Tex. Civ. Prac. & Rem. Code Ann. § 74.301 (Vernon 2005) (capping damages against health care providers); Tex. Civ. Prac. & Rem. Code Ann. § 41.008 (Vernon 2005) (capping punitive damages). We hold that it was incumbent on O'Dell, if seeking to avail himself of the protection of the damage cap, to both plead and prove the defense. *See Shoreline, Inc. v. Hisel*, 115 S.W.3d 21, 25 (Tex. App.—Corpus Christi 2003, pet. denied) (holding that statutory cap found in Texas Labor Code section 21.2585 is an affirmative defense that must be pleaded and proved). Because O'Dell never pleaded the damages cap, we overrule the remainder of O'Dell's fourth issue.

### IV. CONCLUSION

19

Having overruled all four of O'Dell's issues, we affirm the trial court's judgment.


BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

LIVINGSTON, C.J. concurs without opinion.

DELIVERED:  August 5, 2010