

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00434-CV

ALLEN SCOTT

APPELLANT

V.

CHRISTIAN METHODIST
EPISCOPAL CHURCH, SENIOR
BISHOP WILLIAM GRAVES, AND
BISHOP KENNETH WAYNE
CARTER

APPELLEES

**AND**

BISHOP KENNETH WAYNE
CARTER

APPELLANT

V.

ALLEN SCOTT

APPELLEE

----------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

---

[1]*See* Tex. R. App. P. 47.4.

# I. Introduction

Bishop Kenneth Wayne Carter and Allen Scott separately appeal the trial court's judgment in this case, which included a judgment on the jury verdict in favor of Scott and against Carter and a judgment notwithstanding the verdict (JNOV) in favor of Christian Methodist Episcopal Church (the Church).[2] We affirm.

## II. Factual and Procedural Background

Scott was a licensed local preacher for the Church's Eighth Episcopal District (Dallas). Carter, Bishop for the Church's Tenth Episcopal District,[3] asked Scott to come to his home, which Scott asserted was the Tenth Episcopal District's office, to interview for a position as Carter's driver. During this "interview," a sexual encounter occurred between the men, which Carter asserted was consensual and which Scott asserted was not.

According to Scott, Carter asked him to change a light bulb in a storage closet. When he bent down to change the light bulb, Carter was beside him, but when he went to unscrew a second light bulb, Carter was behind him. Scott then felt his pants being pulled down by Carter. Scott turned around, and Carter grabbed Scott's head and put his penis in Scott's mouth. He ejaculated on Scott

[2]No question answered by the jury established liability as to Senior Bishop William Graves, and he is not a party to this appeal.

[3]At the time, the Tenth Episcopal District encompassed Haiti, Jamaica, West Africa, Nigeria, Liberia, and Ghana. Carter testified that he would visit these countries at least four times a year.

2

and into Scott's mouth "within five to ten seconds." Scott testified that Carter instigated the conduct.

According to Carter, Scott instigated the conduct and was the "aggressor." Carter stated that he recalled massaging Scott's shoulder after he finished removing the light bulbs, then Scott touched Carter, and they moved to the couch "where the action took place." Carter testified that he masturbated in front of Scott and that Scott then proceeded to perform oral sex on Carter. Carter said he ejaculated into his hand and not on Scott or in Scott's mouth.

Scott sued Carter, the Church, and Senior Bishop William Graves for negligence, negligence per se, gross negligence, and malice.[4] The jury found: (1) Carter was acting within the scope and course of his employment with the Church; (2) the Church's negligence proximately caused the occurrence; (3) Carter assaulted Scott; (4) the Church was 25% liable and Carter was 75% liable; and (5) Scott was entitled to $350,000 for past mental anguish and $100,000 for future mental anguish. In response to the parties' post trial motions, the trial court entered judgment in favor of Scott against Carter and entered take nothing judgments in favor of the Church and Senior Bishop William Graves. These appeals followed.

---

[4]Scott's allegations included negligent hiring, retention, and supervision.

## III. Carter's Issues

In three issues, Carter argues that the evidence is legally and factually insufficient to support the jury's finding that he assaulted Scott, that the evidence is legally insufficient to support Scott's mental anguish damages, and that the evidence is factually insufficient to support Scott's mental anguish damages such that the trial court should have ordered a remittitur.

### A. Sufficiency Standards of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to

4

support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The trier of fact is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id*.

Further, we review a complaint that damages are excessive for factual sufficiency. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.) (citing *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 847–48 (Tex. 1990), and *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex. 1986)), *cert. denied*, 525 U.S. 1017 (1998). If we find the evidence to be factually sufficient, we are not at liberty to order a remittitur. *Wal-Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 528 (Tex. App.—San Antonio 1996, writ denied) (op. on reh'g); *see also Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641 (Tex. 1987) (stating that if part of a damage verdict lacks

sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict). Whether damages are excessive and whether a remittitur is appropriate are factual determinations that are final in this court. *Ellis*, 971 S.W.2d at 407; *see also* Tex. Const. art. V, § 6; Tex. Gov't Code Ann. § 22.225(a) (West 2004 & Supp. 2011); Tex. R. App. P. 46.3, 46.5.

## B. Assault

Carter challenges the legal and factual sufficiency of the evidence to support the jury's assault finding in this variation of the classic "he said–she said" dispute. As previously recounted, we may not substitute our judgment for that of the trier of fact, who is the sole judge of the credibility of witnesses and the weight to be given their testimony. *See Golden Eagle Archery,* 116 S.W.3d at 761. This is so because we are not witness to the demeanor of those testifying—their voice inflections, body movements, pauses in speech, and other overall visual and verbal cues—which can affect the fact finder's determination of the veracity of their testimonies. *See Kreitzman v. Woodford Livestock Transp*., No. 02-04-00022-CV, 2005 WL 2897644, at *3 (Tex. App.—Fort Worth Nov. 3, 2005, no pet.) (mem. op.) (stating that the jury, not the appellate court, is in the best position to judge the credibility of the evidence because "[w]e cannot discern facial expressions, hear voice inflections, observe body language or witness overall demeanor from a cold black and white record").

Scott recounted a factual scenario pointing to an assault, and Carter recounted a factual scenario pointing to a consensual encounter. As there was

no third party witness or independent evidence supporting either version,[5] it was up to the trier of fact to determine the truth from their testimonies. The jury chose to believe Scott, and the evidence offered by Scott that an assault occurred was more than a scintilla. *See Cazarez*, 937 S.W.2d at 450. Further, this is not a factual dispute in which we will intervene, as we cannot say that the jury's verdict in favor of Scott is supported by evidence that is so weak, or so contrary to the overwhelming weight of all the evidence that the jury's answer to the assault inquiry should be set aside and a new trial ordered. *See Pool*, 715 S.W.2d at 635. Therefore, we conclude that the evidence is legally and factually sufficient to support the jury's assault finding, and we overrule Carter's second issue.

## C. Mental Anguish and Remittitur

In his first and third issues, Carter claims that the evidence is legally and factually insufficient to support the finding that Scott suffered mental anguish damages and that the trial court should have ordered a remittitur.

With regard to mental anguish damages, the Texas Supreme Court has stated,

> The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment,

---

[5]At trial, Scott produced DNA results showing Carter's semen was identified on his shirt, but this does not support or disprove either scenario.

indignation, wounded pride, shame, despair and/or public humiliation.

This definition requires a jury to distinguish between disappointment and severe disappointment, between embarrassment and wounded pride, between anger and indignation. It is little wonder that courts and juries have found this and similar definitions of mental anguish "somewhat unwieldy."

When a challenge is made to the sufficiency of the evidence to go to the jury or to support the jury's finding, the same type of problem persists. The reviewing court must distinguish between shades and degrees of emotion. These distinctions are critical under our substantive law because evidence of lesser reactions cannot support an award of mental anguish damages.

*Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (citations omitted). If a claimant fails to present direct evidence of the nature, duration, or severity of his anguish, we apply traditional "no evidence" standards to determine whether the record reveals any evidence of a high degree of mental pain and distress that is more than "mere worry, anxiety, vexation, embarrassment, or anger" to support any award of damages. *Id*.; *see also Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011) ("Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required.").

Further, the court has also stated,

Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded . . . . While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, "would

8

fairly and reasonably compensate" for the loss. Compensation can only be for mental anguish that causes "substantial disruption in . . . daily routine" or "a high degree of mental pain and distress". There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations.

*Saenz v. Fidelity & Guar. Ins.*, 925 S.W.2d 607, 614 (Tex. 1996) (citations omitted) (stating that the evidence was insufficient to support the jury's $250,000 mental anguish award when the only evidence pertaining to mental anguish was Saenz's testimony that she worried that she and her husband would lose their home and that they could not afford their future medical bills).

Scott testified that he was shocked by the assault and was still shocked at the time of the trial and that he felt less human after the encounter. He testified further that he was taking medication; had been seeing a psychologist since the incident; had problems eating, sleeping, and trusting other people as a result of the assault; was being regularly tested for HIV and other sexually transmitted diseases;[6] and felt that his faith had been shaken. Scott's wife confirmed that Scott had problems eating and sleeping, that he suffered from anxiety, and that he underwent regular blood tests to check for HIV.

Scott also testified that he did not feel like his wife and children looked at him the same now and that his psychologist had suggested that he leave the

---

[6]Scott said that because Carter regularly traveled to Africa, he was concerned that if Carter "ha[d] something, that he could have given it to" him.

9

Church because some of the membership would no longer talk with him, look at him, or pray with him. During Scott's cross-examination, he admitted that he did not report the assault to the police until around thirty days after it occurred.[7] Scott did not testify about any economic loss as a result of the assault. Further, when given an opportunity to describe her husband's anxiety, Scott's wife could only describe him as "restless." However, she also testified that since the incident in March 2007, Scott had been depressed to the point that she felt that she was "losing [her] best friend," and she described his inability to sleep for more than a few hours at a time and said that he had developed stomach problems.

Based on the evidence set out above, the jury could have found that Scott suffered from mental anguish. We conclude that the evidence is legally sufficient. *See Cazarez*, 937 S.W.2d at 450; *see also Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006) (holding that the evidence was legally sufficient to support jury's award of future mental anguish damages when Ramirez and his wife testified that Ramirez continued to be depressed, humiliated, non-communicative, angry, and unable to sleep, that he continued to have headaches and nightmares, and that his daily activities and relationships with his wife and

---

[7]Carter also complains that Scott introduced no evidence of medical expenses related to medical treatment or medication and did not identify the medication he was taking. However, Scott explained his lack of medical expense evidence by testifying that he received treatment at the Dallas VA Medical Center due to his prior service in the Army. He was never asked to identify his medication.

10

daughter continued to be detrimentally affected almost two years after being assaulted); *O'Dell v. Wright*, 320 S.W.3d 505, 514 (Tex. App.—Fort Worth 2010, pet. denied) (holding that Wright presented legally sufficient evidence of compensable mental anguish when she testified about the many occasions on which she had experienced anxiety, nausea, shakes, and nightmares).

Applying the factual sufficiency standard of review to the evidence adduced at trial regarding the impact that the assault had on Scott, considering the nature of the assault and Scott's testimony about the effect that it had on him and his life, we cannot say that the evidence supporting the jury's finding of Scott's mental anguish and damages is so weak or so contrary to the overwhelming weight of all the evidence as would lead us to conclude that the damages are excessive. *See Pool*, 715 S.W.2d at 635; *O'Dell*, 320 S.W.3d at 515 (concluding that the amount awarded was fair and reasonable based on the plaintiff's testimony about the disruption to her life and the personal toll taken by the events surrounding an assault and sexual harassment); *see generally E. Tex. Med. Ctr. EMS v. Nieves*, No. 10-09-00055-CV, 2010 WL 5419003, at *1, 3–4 (Tex. App.—Waco Dec. 29, 2010, no pet.) (mem. op.) (affirming an award of $750,000 for past physical pain and mental anguish and $250,000 in future physical pain and mental anguish after an assault and sexual assault); *Fort Worth Cab & Baggage Co. v. Salinas*, 735 S.W.2d 303, 304–05 (Tex. App.—Fort Worth 1987, no writ) (affirming on remand a multi-million-dollar damages award—which included mental anguish—against cab company after a cab driver

raped, orally sodomized, and robbed a woman in front of her two children). Therefore, we conclude that the evidence is factually sufficient to support Scott's mental anguish damages, and we cannot say that the trial court should have ordered a remittitur. We overrule Carter's first and third issues.

## IV. Scott's Issues

In his two issues, Scott appeals the trial court's JNOV as to the Church, contending that the trial court should have entered judgment against the Church and the Senior Bishop in accordance with the jury's verdict. Scott argues that the Church was aware of Carter's prior sexual misconduct, "never should have hired Bishop Carter, nor should the Church have sat silent while one of its Bishops induced unknowing employees into the very situation that occurred on March 22, 2007." He also complains that the trial court erred by disregarding the jury's determination that Carter was working in the scope and course of his employment such that the Church's negligence proximately caused the assault.

The Church responds that the trial court's JNOV was appropriate because there was no evidence that the assault was within the scope and course of Carter's duties and that Carter's predatory actions were not foreseeable.

## A. Standard of Review

A trial court may disregard a jury verdict and render a JNOV if no evidence supports the jury finding on an issue necessary to liability or if a directed verdict would have been proper. *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d

12

392, 394 (Tex. 1991). A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 454 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g).

To determine whether the trial court erred by rendering a JNOV, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern legal sufficiency review. *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). We must credit evidence favoring the jury verdict if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *Islas*, 228 S.W.3d at 651.

**B. Scope and Course of Employment**

The first question put to the jury was whether Carter acted in the scope and course of his employment with the church when he asked Scott to meet with him. Under the theory of respondeat superior, an employer can be vicariously liable for the torts of an employee if the employee is acting within the scope and course of his employment. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007). However, the employer is liable for its employee's tort only

13

when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired. *Id.* (quoting *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002)). If the employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation. *Id.* (quoting *Minyard*, 80 S.W.3d at 577); *see also Sanders v. Casa View Baptist Church*, 898 F. Supp. 1169, 1179 (N.D. Tex. 1995) (noting that sexual misconduct by a member of the clergy is beyond the cleric's scope of employment), *aff'd*, 134 F.3d 331 (5th Cir.), *cert. denied*, 525 U.S. 868 (1998); *Doe v. S. Cent. Spanish Dist. of Church of God*, No. 05-01-01850-CV, 2002 WL 31296620, at *4 (Tex. App.—Dallas Oct. 14, 2002, no pet.) (mem. op., not designated for publication) (stating that under *Sanders*, cleric's sexual misconduct while pastor was beyond the scope of his employment). Because the conduct at issue here was beyond the scope of Carter's position in the Church as a bishop and was in no way engaged in for the benefit of the Church, the trial court correctly granted the Church's motion for JNOV as to whether Carter acted in the scope and course of his employment. We overrule Scott's second issue.

## C. Negligence

The second jury question asked whether the negligence, if any, of the Church proximately caused "the occurrence in question." Claims against an employer for negligent hiring, retention, or supervision are based on direct, rather

14

than vicarious, liability. *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 49 (Tex. App.—Fort Worth 2002, no pet.). The main advantage to this type of claim is that it does not require "a finding that the employee was acting in the scope of his employment when the tortious act occurred." *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 496 (Tex. App.—Fort Worth 2002, no pet.) (op. on reh'g). "[A]n employer is liable for negligent hiring, retention, or supervision if it hires an incompetent or unfit employee whom it knows, or by the exercise of reasonable care should have known, was incompetent or unfit, thereby creating an unreasonable risk of harm to others" that proximately causes damages. *Morris*, 78 S.W.3d at 49; *see also Ramirez*, 196 S.W.3d at 796 ("Negligence in hiring requires that the employer's 'failure to investigate, screen, or supervise its [hirees] proximately caused the injuries the plaintiffs allege.'" (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)). Absent a showing of foreseeability, an employer cannot be liable as a matter of law for negligent hiring, supervision, or retention. *Wrenn*, 73 S.W.3d at 496.

### 1. Evidence

Pastor Woodrow Foreman testified that in the 1980s or 1990s, he had heard that Carter "liked boys . . . he was gay," and he referenced an incident that occurred in Mississippi in 1990, in which a young male musician stood up on Sunday before the church service was over and said he wanted Carter to stop bothering him. Foreman also stated he recalled mentioning to Scott a long time before the "interview" that he had heard Carter was gay and told Scott at some

15

point "to be careful" because of the rumors he had heard.[8] However, he also testified that he was not worried that Carter would attempt to rape Scott. Once Foreman heard about the incident from Scott, he did not report it to anyone but

---

[8]The timing of the "be careful" statement is susceptible to different interpretations from Foreman's testimony, but it can be construed to have occurred on the day of the assault.

> Q. Okay. Do you recall—let's kind of focus on the actual incident that occurred between Brother Scott and Bishop Carter.
>
> Brother Scott tells us that you had mentioned to him or he had mentioned to you something about talking with Carter about becoming his driver. Do you recall that?
>
> A. I remember that.
>
> Q. And that he says that you had advised him that he—to be careful, but that—not to worry about it, but to be careful because you had heard that Bishop Carter was gay. Is that accurate?
>
> A. I had talked to him about this long before then.
>
> Q. Okay. And did you tell him to be careful?
>
> A. I think I did.
>
> Q. Okay. And then did you know that he was going over to talk to Bishop Carter about being a driver?
>
> A. I did. He called me that day.
>
> Q. Okay. When you told him about—to be careful, what did you say, do you recall?
>
> A. I don't remember exactly what I said. I just told him to be careful

However, Scott testified Foreman warned him to be careful on the day of the "interview."

16

"may have talked to some people about it." Foreman was concerned about the Church's reputation and said that it was discussed with Scott that "this was not about him nor Bishop Carter but the CME Church."

Reverend Van Carl Williams stated that Scott called him after the incident and told him that Carter had ejaculated on him and asked Williams what he should do. Williams told him that no matter what he decided to do, as his pastor, he would support him. During cross-examination, Williams said that he had heard rumors about Carter's sexuality:

Q. Okay. And have you heard from the Church or anywhere else rumors that have been going on about Bishop Carter?

A. Have I heard from . . .

Q. From the Church or anywhere else, dealings with people in the Church, any rumors about Bishop Carter?

A. Yes.

Q. And have you heard rumors about his sexuality?

A. Yes.

Q. Okay. And have you heard that just from a few people, many people?

A. Few and many are—

Q. Kind of subjective, right?

A. Yes, subjective.

Q. Okay. Fair enough. Fair enough.

Let me ask you this—

A. Have I heard it from more than three people, yes.

Q. Okay.

A. I don't know if that's few or many.

Q. Okay. Okay. Now, do you also know that there are people in the Church who don't like Bishop Carter because of his sexuality?

A. Yes.

Elder Ernest Williams testified that he had heard rumors that Carter was homosexual but that he never investigated the rumors, stating that "it wasn't [his] job to investigate." He also testified that no background check was done on Carter. Senior Bishop William Graves also verified that a background check was not done on Bishop Carter; however, "[e]very four years, when [Carter] makes his report to the General Conference, his character is looked at."

Claude Parker and Michelle Benson testified that they had worked with Carter when all three worked for the Fort Worth Independent School District (ISD) as band directors. In 1999, Parker's and Carter's bands took a trip to Disneyworld, and the two men shared a room at a resort. Parker was late getting to their room on the first night, and when he walked in, he saw Carter masturbating on the bed. Parker immediately walked out of the room and called his "pyramid," which consisted of Benson and his principal, to report what had happened; he filed a complaint with the Fort Worth ISD when they returned from the trip.

18

Benson had hired Carter as an assistant high school band director. She testified that she received a complaint that Carter was "offering young boys money for sexual favors" at a band camp at Prairie View A&M.[9] She reported this incident and filed a complaint against Carter with the Fort Worth ISD. During her testimony, Benson also referred to other complaints that she had received from young men about Carter, but she did not go into detail. She also stated that none of these complaints indicated that Carter had forced himself on any of them. Neither Parker nor Benson was associated with the Church, and there was no evidence that they had communicated with anyone with the Church.

Carl Calhoun testified that in the early 1990s, he was involved in a Gospel Fest with Carter, but like Parker and Benson, he had no connection with the Church. Carter's church had arranged to pay Calhoun and his fellow musicians for providing musical accompaniment for a choir. Calhoun went to pick up the check at Carter's church, and after a tour of the church, Carter made an advance on him. In the church's bathroom, Calhoun opened a stall door and saw Carter "doing . . . something to himself," which appeared to be masturbation. Calhoun said during cross-examination that he remembered Carter grabbing him and pulling at his clothes. Calhoun did not report this incident to the police or to anyone with the Church.

**2. Analysis**

---

[9]Benson clarified that the "boys" in question were college students who helped run the band camp.

The jury was charged that "[i]n order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom." Therefore, an affirmative finding of negligence by the jury required evidence that it was foreseeable by the Church clergy that Carter would assault Scott on the occasion in question. Assault was defined for the jury as follows, "A person commits an assault if without consent he intentionally or knowingly causes physical contact with another when he or she knows or should reasonably believe that the other will regard the contact as offensive or provocative."

Reviewing the evidence known to the Church's clergy concerning Carter's attempted physical relationships with other males, and bearing in mind the definition of assault and that the only evidence of Carter actually touching another individual came from Carl Calhoun, who was not associated with the Church and who did not report the incident to the police or the Church, we hold that there was no evidence that it was foreseeable to the Church that Carter would assault Scott. The trial court therefore correctly granted the Church's motion for JNOV as to the second jury question, and we overrule Scott's first issue.

## V. Conclusion

Having overruled all of Scott's and Carter's issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and MCCOY, JJ.

DELIVERED:  January 5, 2012