

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-11-00037-CV

THE STATE OF TEXAS                                      APPELLANT

V.

LITTLE ELM PLAZA, LTD., A                              APPELLEES
TEXAS LIMITED PARTNERSHIP
AND LEGACY BANK OF TEXAS

**AND**

LITTLE ELM PLAZA, LTD., A                              APPELLANT
TEXAS LIMITED PARTNERSHIP

V.

THE STATE OF TEXAS                                     APPELLEE

----------

FROM THE PROBATE COURT OF DENTON COUNTY

----------

# MEMORANDUM OPINION[1]

----------

In four issues, the State of Texas (the State) appeals the trial court's judgment awarding $2,327,913 to Little Elm Plaza, Ltd. (Little Elm) as damages resulting from the State's condemnation of part of Little Elm's property. The State requests that we reverse the trial court's judgment and remand this case for a new trial. Little Elm disagrees with the contentions raised within the State's issues, but in a cross-appeal, Little Elm raises four issues of its own, arguing that we should reverse the trial court's judgment and render a judgment awarding damages of $4,075,000.[2] We reverse and remand for a new trial.

## Background Facts

Before 2009, Little Elm owned a 3.811-acre tract of land in the Town of Little Elm (the Town). One side of Little Elm's predominantly triangular property bordered FM 720, by which cars entered the property. The side of Little Elm's property that bordered FM 720 was approximately 830 feet long. Most of the property was zoned for light commercial use. Another part of the property, in the northeast corner, was zoned for single-family residential use. The residential

---

[1]*See* Tex. R. App. P. 47.4.

[2]Although appellee Legacy Bank of Texas was a party in the trial court by being named in the State's condemnation petition and was included in the trial court's judgment, it did not participate in the trial, did not appeal the trial court's judgment, and has not filed a brief on appeal.

2

part had not been developed, and it contained a curb opening by which cars accessed the commercial part.

In 2009, the property contained four buildings (each of which was constructed well before 2009): an over-28,000-square-foot retail building that contained, among other businesses, a grocery store and a liquor store; a 9,000-square-foot retail building that contained a Subway restaurant and a beauty supply store; a 2,286-square-foot medical/office building; and a 2,499-square-foot building containing self-storage units. The property also had approximately 140 parking spaces. To operate, each of the businesses on Little Elm's property had to obtain a certificate of occupancy from the Town.

Little Elm's property contained features that did not conform to the Town's zoning ordinances, such as an inadequate number of parking spaces, insufficient building setbacks, noncompliant architecture, and insufficient landscaping. But because these features existed before the property was within the Town's jurisdiction and before the Town's zoning ordinances were effective, the features were classified as legal nonconformities, meaning that they were grandfathered.[3]

Stacy Standridge is Little Elm's general partner and its sole decision maker. When Little Elm purchased the property in 2004 for just under $4 million, Standridge knew of the State's plans to expand FM 720. In September 2008, John Taylor, the Town's director of planning and development, sent a letter to

---

[3]The evidence at trial indicated that the Town did not adopt a home-rule form of government until 2001 or 2002.

3

some of the property owners along FM 720, including Little Elm (through Standridge).  The letter stated in part,

> It is our understanding that you are the owner of the above[-] referenced property from which the Texas Department of Transportation ("TxDOT") is seeking to acquire property for the expansion and improvement of [FM 720] within the Town of Little Elm . . . .
>
> After consultation with our Town Attorney, and after review of the Town's zoning provisions regarding alterations and enlargements of nonconforming structures or uses (sometimes called "Grandfathered Rights"), it is the Town's position that the removal of certain improvements from your property and/or the reduction in the size of your property as a result of TxDOT's acquisition will cause the current nonconforming structure on your property to lose its nonconforming or "Grandfathered" status.  As a result, you will be required to bring your property up to all current Town codes and ordinances in order to continue to operate a business on your property.
>
> The Town Council is aware of this situation and, on September 2, 2008, it adopted a formal policy statement that requires all property owners of property that will be in violation of Town codes and ordinances as a result of TxDOT's . . . acquisitions to (1) take all required steps to bring their properties into full compliance with all Town codes and ordinances or (2) demolish the unlawful structures within 60 days of the structure becoming illegal. The Town Council has instructed Town staff to make every effort to accommodate property owners and to work with them to see if solutions can be crafted to address the loss of nonconforming use rights caused by TxDOT's acquisition of land . . . .
>
> This letter is sent to you as part of the Town's accommodation efforts to ensure that you are fully aware of the Town's position regarding the loss of you ability to lawfully maintain and operate a business on your property once TxDOT has physically altered your land.

About a month after Taylor sent the letter quoted above, the Town passed Ordinance 918.  The ordinance stated in part,

4

WHEREAS, the Town Council desires to establish standards and regulations for when right-of-way is acquired by a governmental agency, and has determined that the amendments set forth herein should be adopted . . . .

. . . .

**Sec. 22-147.  Regulations and Exemptions.**

a)  In the event a Right-of-Way Acquisition[4] by a Governmental Agency causes a property or its improvements to be in violation of Town zoning ordinances, subdivision rules, or other town ordinances said property shall be exempt from said provisions to the extent said violation is caused by the Right-of-Way Acquisition, subject to the following:

. . . .

3) Compensation provided; exemption inapplicable.

(a)  If a Governmental Agency offers compensation to a property owner for the demolition of improvements or for other Curative Measures which renders the property or its improvements to be in violation of Town zoning ordinances, then the property shall not be eligible for exemptions under this section.

(b)  The Planning Director is authorized to provide notice to any affected property owner, lien holder, and/or certificate of occupancy holder, listing the items of noncompliance for which no exemption is being provided under this section.

. . . .

---

[4]Under the ordinance, a "Right-of-Way Acquisition" is the "securing of [a] right-of-way through negotiation, purchases, bargain, trade, donation, condemnation or other means . . . ."

5

4)  The Building Official is authorized to revoke a Certificate of Occupancy of any building or structure for which compensation has been offered to be paid for the building or structure to be demolished as part of a Right-of-way Acquisition by a Governmental Agency and the property has been physically impacted by the roadway project construction.

.  .  .  .

6)  A Certificate of Occupancy shall not be issued for any building or structure for which compensation has been paid for the building or structure to be demolished or for other Curative Measures until such time that the property and its improvements either come into full compliance with all applicable ordinances of the Town . . . or the Curative Measures, for which the compensation was paid, have been completed.

In conjunction with passing Ordinance 918, the Town created an agenda information sheet.  Under the heading of "PLANNING ANALYSIS," the agenda information sheet stated in part,

On September 2, 2008, the Council adopted the following policy relating to properties impacted by [a] right-of-way acquisition:

All property owners of property that will be in violation of Town codes and ordinances as a result of TxDOT's [FM 720] acquisitions are required to (1) take all required steps to bring their properties into full compliance with all Town codes and ordinances or (2) demolish the unlawful structures within 60 days of the structure becoming illegal.  The Town Council has instructed Town staff to make every effort to accommodate property owners and to work with them to see if solutions can be crafted to address the loss of nonconforming use rights caused by TxDOT's acquisition of land . . . .

[Ordinance 918] clarifies how these properties will be addressed . . . .  The ordinance exempts a property from an

6

ordinance requirement if a property becomes in violation due to [a right-of-way] taking and there are **no** payments made to the property owner for **damages to the remainder** . . . .

However, if the property owner is paid **any damages to the remainder** then **all** ordinances must be met before the property can continue to be used.

In January 2009, the State filed a petition to condemn, through eminent domain, a 12,504-square-foot (.287-acre) portion of Little Elm's property that abutted FM 720.[5] In the petition, the State contended that it needed the property to expand the roadway and that the State and Little Elm had been unable to agree upon the damages caused by the acquisition.

The trial court appointed a panel of three special commissioners to assess Little Elm's damages.[6] Following a hearing, the special commissioners awarded $222,757 to Little Elm. Little Elm objected to the award and demanded a jury trial on the State's petition.[7] On April 22, 2009, the State deposited the amount of the special commissioners' award into the registry of the court, which gave the

---

[5]*See* Tex. Const. art. I, § 17(a) ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . ."); *Coble v. City of Mansfield*, 134 S.W.3d 449, 451 n.1 (Tex. App.—Fort Worth 2004, no pet.) ("Eminent domain is the right or power of a sovereign state to appropriate private property for the promotion of the general welfare."). The 12,504 square feet comprised a fifteen- to nineteen-foot variable width strip of land across the front of Little Elm's property. The condemned part equaled about 7.5 percent of the property.

[6]*See* Tex. Prop. Code Ann. § 21.014(a) (West Supp. 2012).

[7]*See id.* § 21.018(a) (West 2004).

State the ability to take possession of the property.[8]  The parties agree, therefore, that April 22, 2009 became the official date of the State's condemnation of Little Elm's property.[9]

In May 2009, the Town passed Ordinance 954, which stated in part,

Waiver or Variance.

a. . . . [A]ny property owner that receives compensation from a governmental agency in an eminent domain action for the demolition of improvements, or for other curative measures which render the property or its improvements to be in violation of Town zoning and development ordinances, may request a waiver or variance from the applicable Town ordinances if the property owner contends that the amount of compensation received is inadequate to pay for all of the real or personal property improvements, modifications, alterations[,] and other requirements imposed by the Town as a result of the loss of property occasioned by the eminent domain action.

b. . . . The Town Council may grant a waiver or variance from any Town standard or requirement . . . if the Town Council finds that the imposition of a particular Town standard or requirement upon a property owner will result in an undue hardship to a property owner that has not received compensation adequate to pay for all of the real or personal property improvements, modifications, alterations[,] and other requirements imposed by the Town as a result of the loss of property occasioned by the eminent domain action.

Little Elm hired Robert Baldwin, a land planner, to examine the effects of the condemnation.  According to Baldwin, the State's condemnation, which

---

[8]*See id.* § 21.021(a)(1) (West 2004).

[9]*See City of Fort Worth v. Corbin*, 504 S.W.2d 828, 830 (Tex. 1974) (stating that the date of the taking is the date in which the condemnor takes actual possession of the property or takes constructive possession by depositing the special commissioners' award).

8

affected parts of the commercial and residential sections of the property, required the elimination of approximately forty of Little Elm's original parking spaces. Thus, Little Elm's property became more nonconforming to the Town's ordinances regarding parking than it was before the condemnation.

Baldwin reviewed and considered Taylor's September 2008 letter and Ordinance 918, and he concluded, in an opinion expressed in a pretrial deposition and later at trial, that as a result of those documents, the features on Little Elm's property that did not comply with the Town's zoning ordinances would lose their legally nonconforming status, Little Elm would not be able to bring its property into compliance, and Little Elm would therefore be required to demolish all of the buildings on its property. In his land planning with respect to Little Elm's property, Baldwin spoke to some of the Town's officials, including Taylor and Senior Planner Dusty McAfee, who is subordinate to Taylor.

Little Elm designated Baldwin and Robert Hawkins, a real estate appraiser, as experts. Hawkins testified in his deposition that McAfee had told him that the Town "didn't care much" for Little Elm's property and "that for some time the [Town] had been trying to do something about the property." Hawkins also said that Taylor had told him that the Town had the authority under Ordinance 918, upon a taking, to require a property owner to bring all previous legal nonconformities into compliance with the Town's regulations. Before the deposition, Hawkins had based his written appraisal on what he said that Taylor had told him and on the "**Extraordinary Assumption that . . . the Town [would]**

9

**require property owners to cure any and all code non-conformance[s] . . . , even to the extent of curing items previously considered legal, but non-conforming.**"

According to Hawkins, Taylor was the "deciding party in [Ordinance] 918." Hawkins said in the deposition that Taylor had expressed that he "intended fully to force the property owner to bring the entire property and all nonconformities into compliance." Hawkins acknowledged that his understanding of Ordinance 918 was that if the State condemned one parking spot on a property and compensated the owner for that spot, the owner would have to cure all existing nonconformities on the property regardless of whether they were related to parking. Hawkins believed that it would be cheaper to demolish the buildings on Little Elm's property than to bring them into compliance with the Town's regulations. In the deposition, Hawkins discounted the effect of Ordinance 954 on Little Elm's alleged duty to cure all nonconformities because Ordinance 954 was not in effect on the date of the State's condemnation and because that ordinance did not guarantee that a property owner could obtain a variance.

The State filed pretrial motions to exclude the proposed expert opinions from Baldwin and Hawkins. The State contended that these experts had incorrectly opined, without sufficient factual support and in contravention to Ordinance 918, Ordinance 954, and Taylor's deposition testimony, that as a result of the condemnation, Little Elm would be required to cure all nonconformities on the property, therefore requiring complete demolition of the

10

property's improvements. The State contended that the experts' opinions in that regard were neither relevant (because the opinions were not sufficiently tied to the facts of the case) nor reliable (because they were speculative) and that the opinions should therefore be excluded under rule of evidence 702.[10]

Before the trial began, on August 13, 2010, Baldwin wrote a memorandum to Taylor in which Baldwin expressed his understanding that Little Elm's property was "currently a legal nonconforming [property] and [Little Elm would] be allowed to reconfigure the site, provided that [Little Elm did] not make the site more nonconforming." In September 2010, the Town approved a conceptual site plan that Baldwin had prepared. Although Baldwin had stated in his deposition that Little Elm would need to demolish all of the buildings on its property and planned to testify to that opinion at trial, the approved conceptual site plan indicated otherwise; the plan allowed for three of the four buildings to remain on Little Elm's property. In fact, an "Agenda Information Sheet" that was prepared in the process of the approval of the conceptual site plan contradicted Baldwin's opinion by stating in part that none of the elements of Little Elm's property that were nonconforming on the date of the taking would "have to be corrected unless the property [was] 100% damaged by TXDOT," which was "not anticipated." The Agenda Information Sheet relating to the approved conceptual site plan

---

[10]*See* Tex. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.").

described the effect of Ordinance 918 as "establishing a legal framework for the Town to follow as it relates to properties being made non-conforming or more non-conforming due to a TXDOT taking." The Agenda Information Sheet also stated that under Ordinance 918, "if the property owner is paid **any damages to the remainder** then the elements of the property which are made non-conforming or more non-conforming must be brought up to code before the property can continue to be used."

Little Elm sought to exclude evidence of the Town's approval of Baldwin's conceptual site plan on the ground that the submission of the plan occurred during settlement negotiations between Little Elm and the State. The State filed a pretrial document arguing that the approved site plan was admissible "as rebuttal evidence of Baldwin's inaccurate report" and also under the rule of optional completeness.

In the middle of September 2010, weeks before the trial began, the trial court held a hearing on some of the parties' pending motions. The court denied the State's motion for a late designation of Taylor as an expert witness (in part based on the trial court's conclusion that Taylor would not be allowed to opine on the meaning of the City's ordinances), but the trial court recognized that either party could call Taylor as a fact witness. Because of rulings from another pretrial hearing and objections raised during the trial, the trial court (1) denied Little Elm's motion, predicated on the State's alleged discovery abuse, to totally strike testimony from the State's appraisal expert, Daniel Wright; (2) excluded evidence

of Wright's "Scenario 2" appraisal (in which he would have testified that Little Elm sustained less than $500,000 in total damages because Little Elm could have rezoned the residential part of its property to use that part to cure the loss of its parking spaces); (3) permitted testimony from Baldwin about his opinion that the buildings on Little Elm's property required demolition because of Taylor's letter and Ordinance 918; and (4) excluded evidence of matters that occurred after the date of the condemnation that may have reflected the Town's intent with respect to Little Elm's property, including the Town's approval of Baldwin's conceptual site plan and evidence concerning the language of Ordinance 954 (although the court allowed evidence that as of the date of condemnation, it was reasonably foreseeable that some ordinance that granted relief from Ordinance 918 could be passed).

During the State's cross-examination of Baldwin at trial, he acknowledged that in his experience as a land planner, he had never seen an ordinance that required total demolition of buildings because of the condemnation of a fifteen-foot strip of land that did not directly affect the buildings. He also conceded that he had not analyzed whether some of the buildings on Little Elm's property could be demolished to save the other buildings. Next, Baldwin admitted that Taylor had told him that Ordinance 918 did not apply "unless 100 percent of the improvements were damaged out by TxDOT," but Baldwin stated that he nonetheless construed Ordinance 918 differently than how Taylor had construed it. Baldwin agreed that Taylor's letter could not have bound the Town about its

13

plans for Little Elm's property, and Baldwin testified that between Taylor's letter and Ordinance 918, "[t]he ordinance would govern." Baldwin also conceded that at the time of the trial, the Town had not, as a result of Ordinance 918, revoked any certificate of occupancy or required demolition of any building. Rather, Baldwin testified that the businesses at Little Elm's property had continued to operate in the eighteen months since the April 2009 condemnation. As to possibly using Little Elm's residential property to cure some of the overall deficiencies on Little Elm's property, Baldwin stated that the residential property "ha[d] the wrong zoning on it."

During Hawkins's testimony at trial, he agreed with Baldwin that Taylor's letter and Ordinance 918 caused Little Elm's buildings to lose their legally nonconforming status and that because the buildings had no economic value as illegal, they would require demolition. Hawkins also testified that the letter and ordinance affected the perception of risk in the marketplace. He explained,

> [T]here was no way to cure the nonconformities. And any prospective purchaser looking at the property would have to be shown, under the property condition report, this ordinance and the letter. And as a result, they wouldn't attribute any value to the existing improvements. So then you're left with a vacant piece of land [that] you are effectively buying.

Hawkins concluded that the remainder of Little Elm's property (the part not condemned by the State) had received approximately $4 million in damages attributable to the condemnation because, in part, "no buyer in his right mind would attribute value to the improvements," and Little Elm had therefore lost that

14

value.[11]  Hawkins stated that Taylor had told him that "all of the nonconformities on the property would have to be cured."

On cross-examination, Hawkins stated that when he submitted his report, he did not know that part of the area of the State's condemnation involved the residential part of Little Elm's property.  He agreed that he had presumed that Little Elm's residential property was bought for "parking expansion," but he stated that through his conversations with the Town's officials, he understood that the property would not be rezoned.  Hawkins also admitted that when he discussed his interpretation of Ordinance 918 in his report, he assumed that sections of that ordinance that required an offer of compensation from the State to trigger a landowner's obligations would apply although he did not know at the time of the report about whether the State had offered compensation to Little Elm.  Hawkins conceded that a prospective buyer of Little Elm's property would likely approach the Town to determine precisely what the Town would allow with respect to the buildings on the property.

During the State's direct examination of Wright, he opined that Ordinance 918's plain language did not divest Little Elm's property of its grandfathered status or require Little Elm to cure all of its nonconformities.  He also stated that,

---

[11]On appeal, the State does not contend that Hawkins's initial valuation of Little Elm's property was improper or that the admission of his testimony on remainder damages was erroneous for reasons other than his opinion about the effect of Taylor's letter and Ordinance 918.  We will not detail Hawkins's appraisal testimony as it relates to issues other than those that the State challenges.

as explained in his "Scenario 1" written appraisal (the only appraisal on which the trial court allowed him to testify at trial), all of the parking spaces lost through the condemnation could be recovered through demolishing about one-third (10,954 square feet) of the largest of the four buildings. Wright testified that the remainder damages to Little Elm's property from the State's condemnation, including the proposed cost of demolishing part of one of Little Elm's buildings to restore parking (as valued by an independent company) and the loss of value as a result of the diminished size and income-generating potential of that building, equaled $1,134,171. Wright also stated that based on "market evidence" that he had evaluated, it was reasonably foreseeable that Little Elm's residential property could be rezoned as commercial property.

At trial, Little Elm objected to any testimony from Taylor on the grounds that he was not identified as a trial witness by the State and was not qualified to interpret Ordinance 918 or to state how the ordinance might be applied, but the trial court allowed him to testify. Taylor stated that Ordinance 918 superseded the letter that he had sent out to select property owners regarding the effects of condemnation. Taylor also expressed that the plain language of Ordinance 918 did not state that property owners would lose any grandfathered, legal nonconformities. Taylor denied that he ever told Baldwin or Hawkins that all of Little Elm's buildings would require demolition or that all of the buildings' nonconformities would need to be brought into compliance with the Town's zoning ordinances. Taylor conceded on cross-examination, however, that in

16

March 2010, he wrote an e-mail indicating that the nonconformities on Little Elm's property that would need curing were dependent on "the amount of damages that [were] paid by TXDOT and what those damages [were] paid for."

The jury returned a verdict awarding Little Elm $95,000 for the 12,504 square feet of Little Elm's property that the State condemned (a value that Hawkins had assigned)[12] and $2,232,913 for the reduction in market value to the remainder of Little Elm's property. The trial court signed a judgment that incorporated the jury's verdict. The State filed a motion for new trial, and after the trial court denied that motion, the State brought this appeal. Little Elm also appealed.

## Evidentiary Complaints

In its first issue, the State contends that the trial court improperly admitted Baldwin's and Hawkins's expert testimony that because of Taylor's letter and Ordinance 918, the State's condemnation required the demolition of Little Elm's buildings. In its second issue, the State argues that the trial court erred by excluding testimony from the State's experts about Scenario 2, the land plan that would have allowed for recovery of the parking spaces that were lost through condemnation by placing the spaces on Little Elm's residential property. In its third issue, the State asserts that the trial court erred by excluding evidence concerning Ordinance 954 and the Town's approval of Baldwin's conceptual site

---

[12]Wright testified that the value of the condemned part was $209,021.

17

plan. In its fourth cross-issue, Little Elm argues that the trial court erred by denying a challenge to the State's expert testimony.

**Standard of review and applicable law**

We review a trial court's admission or exclusion of evidence under an abuse of discretion standard. *See State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (op. on reh'g); *Shelton v. Sargent*, 144 S.W.3d 113, 123 (Tex. App.—Fort Worth 2004, pets. denied). "To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles—in other words, whether the act was arbitrary or unreasonable." *Shelton*, 144 S.W.3d at 123. Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.*

The United States and Texas constitutions require governments to compensate landowners for taking their property for a public use. U.S. Const. amend. V (requiring just compensation when the government takes private property for public use); Tex. Const. art. I, § 17(a). When only part of a landowner's property is taken, adequate compensation is required both for the part taken and for any damages to the remainder. *State v. Schmidt*, 867 S.W.2d 769, 772 (Tex. 1993), *cert. denied*, 512 U.S. 1236 (1994); *Coble*, 134 S.W.3d at 454. The proper measure of compensation damages when only a portion of a tract is taken for public use is the market value of the part taken and the

18

difference between the market value of the remainder property immediately before the condemnation and the market value of the remainder property immediately after the condemnation, taking into consideration the nature of any improvements and the use of the land taken. *Coble*, 134 S.W.3d at 454.

Courts should admit as market-value evidence such matters as suitability, adaptability, surroundings, conditions before and after, and all circumstances which tend to increase or diminish the remainder's market value. *Id.* A condemnee "may recover damages which are reasonably foreseeable, and [the condemnee] may show the reasonably probable uses of the tract taken that are calculated to depress the value of the remainder tract and thus enhance the recovery of damages." *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972). Damages due to required modifications to the remainder, as a result of the condemnation, or damages due to a loss of improvements on the remainder because of the condemnation may, on a proper showing, be compensable. *State v. Centennial Mortg. Corp.*, 867 S.W.2d 783, 784 (Tex. 1993) (holding that evidence of costs of modifications to a condemnee's remainder property that were required as a result of the condemnation was admissible to show a decrease in market value), *cert. denied*, 513 U.S. 812 (1994). But evidence should be excluded "relating to remote, speculative, and conjectural uses, as well as injuries, which are not reflected in the present market value of the property." *Schmidt*, 867 S.W.2d at 773; *Tex. Elec. Serv. Co. v. Campbell*, 161 Tex. 77, 81, 336 S.W.2d 742, 745 (1960); *Coble*, 134 S.W.3d at 455.

19

**The admission of Baldwin's and Hawkins's testimony**

The State contends that the opinions from Baldwin and Hawkins that Little Elm would be required to cure all nonconformities on its property, thus requiring the demolition of its buildings, were inadmissible because they were irrelevant and unreliable. Before trial, through written motions and a pretrial hearing, the State sought exclusion of such opinions.

As explained by our supreme court, for an expert's testimony to be admissible under rule of evidence 702,

> the expert must be qualified, and the expert's opinion must be relevant to the issues in the case and based upon a reliable foundation. . . .
>
> The relevance requirement, which incorporates traditional relevancy analysis under Texas Rules of Evidence 401 and 402, is met if the expert testimony is "'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" Evidence that has no relationship to any issue in the case does not satisfy rule 702 and is thus inadmissible under rule 702, as well as rules 401 and 402.
>
> In contrast, Rule 702's reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions. Under this requirement, expert testimony is unreliable if it is . . . no more than "'subjective belief or unsupported speculation.'" Expert testimony is also unreliable if there is too great an analytical gap between the data the expert relies upon and the opinion offered. In applying this reliability standard, however, the trial court does not decide whether the expert's conclusions are correct; rather, the trial court determines whether the analysis used to reach those conclusions is reliable.

*Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628–29 (Tex. 2002) (citations omitted); *see Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870 ("To be

20

relevant, the expert's opinion must be based on the facts; to be reliable, the opinion must be based on sound reasoning and methodology."); *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002) (explaining that the relevancy and reliability requirements under rule 702 apply to "the testimony of expert appraisal witnesses in condemnation actions").

In *Coble*, the City of Mansfield had condemned part of Coble's land to build streets. 134 S.W.3d at 451. Before the condemnation occurred, the City had adopted an ordinance requiring screening walls to be erected when a residential subdivision abutted a thoroughfare. *Id.* at 452. Coble proffered expert testimony that if he developed his land, which carried single-family residential zoning, into a residential subdivision, the costs of complying with the ordinance would be $186,980, and Coble contended that those costs should therefore have been compensable in the condemnation action. *Id.* at 452, 455. We held such testimony to be inadmissible, explaining that the testimony was remote, speculative, and conjectural because, in part, Coble's tract had not been platted for residential subdivision development, Coble had applied to change the zoning on his land to commercial, and Coble was "seeking to recover the estimated cost of complying with an ordinance, the applicability of which had not yet been determined at the time of taking." *Id.* at 455–56. We explained that Coble's proffered expert testimony was

> based upon the speculative assumption that residential subdivision
> development of the remainder tract *will* occur, and that the property
> *will* be platted so that the layout of lots will trigger the necessity to

21

> incur the costs to comply, bypassing all of the problems as well as the steps that might occur with possible residential development of the tract.

*Id.* at 457. We also noted that Coble had offered "no evidence that he would be unable to get a variance or a modification of the screening wall requirement from the Mansfield Planning and Zoning Commission." *Id.* We further discussed how Coble was effectively "seeking to recover the potential future costs of complying with the ordinance as damages for inverse condemnation by a regulatory taking, when the applicability of [the ordinance] had not been determined at the time of the eminent domain proceeding." *Id.* at 458. We explained that such an inverse condemnation claim would not be ripe because "no regulatory taking occurs until the governmental entity charged with implementing the regulation reaches a final decision regarding application of the regulation to the property." *Id.*; *see City of El Paso v. Madero Dev.*, 803 S.W.2d 396, 400 (Tex. App.—El Paso 1991, writ denied), *cert. denied*, 502 U.S. 1073 (1992).

Earlier this year, we discussed and distinguished *Coble* in a case with variant facts. *See State v. Ledrec, Inc.*, 366 S.W.3d 305, 311 (Tex. App.—Fort Worth 2012, no pet.). Ledrec, Inc. (Ledrec) owned property in the extraterritorial jurisdiction of the City of Mansfield, and to widen a road, the State condemned part of the property. *Id.* at 307. Ledrec's expert opined that the remainder damage from the condemnation was $248,000, reasoning that

> because the front two buildings would be only twenty feet from the road after the taking, the property would not be compliant with most of the zoning classifications Mansfield would likely impose on the

22

property, all of which require minimum setback lines of thirty feet from the road. Although this thirty-foot setback would not apply to the property while it was only in the [extraterritorial jurisdiction] (unless Ledrec were to replat the property), once Mansfield annexed the property, the front two buildings would be nonconforming under Mansfield's zoning ordinance.

*Id.* The State contended that the opinion from Ledrec's expert was inadmissible because it was "based on the mere possibility that the buildings [would] become functionally obsolete and no longer generate income as of the day of the taking even though Mansfield ha[d] not yet annexed the property and there [was] no evidence as to when Mansfield [would] annex it." *Id.* We framed the question presented by these facts as whether "an expert can testify to a damage amount that is based on the expert's opinion that remainder property loses some or all of its income producing potential, and thus market value, as of the date of taking due to the mere potential of future annexation." *Id.* at 310–11. After discussing *Coble*, we held that the testimony from Ledrec's expert was admissible, reasoning,

> [The expert's] testimony here is that, based on his over twenty years of experience as an appraiser, a willing buyer would presume that the front two buildings would not generate any income as of the date of taking (regardless of whether they were at that time actually producing income)—because of the possibility that an annexation would force a change in use of the buildings—and would therefore assign no value to those buildings in a purchase. Thus, [the expert's] testimony is not based on a speculative or remote possibility—the property's market value at the time of a future annexation—but rather, it is based on an assessment of the current value a willing buyer and seller would place on the remainder property as of the date of taking because of the perception that annexation could limit the property's use. Whether this opinion is

23

correct is not for this court to resolve; whether it is based on a proper measure of damages is.

*Id.* at 311 (footnotes omitted) (citation omitted). In a footnote, we described the difference between the opinion offered by Ledrec's expert and the opinion at issue in *Coble* as "subtle" because

> although [the expert's] report . . . state[d] that the taking would actually render the front two buildings functionally obsolete and unleasable as of the date of taking—as opposed to stating that a willing buyer and seller would *presume* that the buildings would become functionally obsolete and unleasable as of the date of taking—his deposition testimony, construed in Ledrec's favor, [was] that he considered both a buyer's and seller's positions in making his determination of market value.

*Id.* at 311 n.6.

Considering our decisions in *Coble* and *Ledrec, Inc.* together, the distinction of admissibility that we have applied is that an expert may testify about how an uncertainty with regard to a governmental action may have affected the market value (in other words, how potential buyers and sellers would weigh the risks related to the property) on the date of the taking, but an expert may not opine about how that uncertainty will actually be resolved in a date after the taking when that opinion is speculative or conjectural. *See Ledrec, Inc.*, 366 S.W.3d at 311 & n.6; *Coble*, 134 S.W.3d at 455–58; *see also Heddin v. Delhi Gas Pipeline Co.*, 522 S.W.2d 886, 888 (Tex. 1975) (explaining that fear in the minds of the buying public may be considered in a condemnation case when there is a basis in reason for the fear, the fear enters into the calculations of persons who deal in the buying and selling of similar property, and the market

24

experiences depreciation because of the fear); *Melton v. State*, 395 S.W.2d 426, 429 (Tex. Civ. App.—Tyler 1965, writ ref'd n.r.e.) (explaining that "market value . . . should be based upon a reasonable cash value and a reasonable use for reasonable adaptability, and not upon some speculative, contemplated, use to be made of the land").[13] The speculative and conjectural nature of the latter type of testimony in condemnation cases that have facts similar to those in this case may be understood by considering the law related to inverse condemnation cases, which similarly to the damage theory presented by Little Elm, concern how the government's actions may affect the value and use of property. *See City of Houston v. Maguire Oil Co.*, 342 S.W.3d 726, 735 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Those cases generally become jurisdictionally ripe (as not having an injury that is too remote to be adjudicated) only after the

---

[13]The Florida Supreme Court has explained the distinction that we have illustrated by our decisions in *Coble* and *Ledrec, Inc.* as follows:

> When admitting evidence of future contingencies . . . the trial court must ensure that the finder of fact does not mistakenly assume that their cost or value can be considered apart from the effect on market value, such as by simply assuming that these contingencies must inevitably occur and then valuing the property accordingly. After all, we are dealing with contingencies here, not certainties. There always is a risk that such costs or future values may prove greater or less than a knowledgeable buyer might assume. . . . To prevent juror confusion, the trial court and the parties may wish to see that testimony as to future costs and values is not given in the form of contingent *future* dollar amounts, but only in terms of the effect on the property's value as of the moment of the taking.

*Broward Cnty. v. Patel*, 641 So. 2d 40, 43 n.7 (Fla. 1994).

25

government reaches a final decision about how a regulation applies to property and after a plaintiff has been denied a variance from the government. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 929 (Tex. 1998), *cert. denied*, 526 U.S. 1144 (1999); *Coble*, 134 S.W.3d at 458.

Applying the principles illustrated by *Coble* and *Ledrec, Inc.* to this case, we believe that Baldwin's testimony went too far. In both the pretrial hearing on the State's motion to exclude his testimony and in his testimony before the jury at trial, Baldwin stated that the Town would force Little Elm to comply with all of its codes and that, since Little Elm could not do so, Little Elm would need to demolish its buildings. When Baldwin was asked during the pretrial hearing about his "final analysis of the remainder property," he stated,

> Well, after reading the letter, the ordinance, and the City's policy statement that was part of the ordinance adoption, it seemed to me that the property owner was going to be compelled to bring the property into full compliance with all the City ordinances. That's what it says. And I can't see how you're going to be able to bring buildings that have setback issues, side and rear setback issues, buildings that don't meet the architectural standards, meaning they have to be articulated both vertically and horizontally, I don't see how you can bring them into full compliance . . . . And so I think that the building *is going to have to be torn down to meet the requirements of Ordinance 918*. [Emphasis added.]

In front of the jury, Baldwin testified that Little Elm could not achieve full compliance with the Town's zoning ordinances after the State's condemnation and that Little Elm would be required to demolish all of its buildings.

Under the facts of this case, Baldwin's opinion that Little Elm's buildings would require demolition was impermissibly speculative because, among other

26

possible reasons, (1) although Taylor's letter stated that Little Elm would be required to "bring [its] property up to all current Town codes and ordinances,"[14] it also stated that the Town intended to "make every effort to accommodate property owners and to work with them to see if solutions [could] be crafted to address the loss of nonconforming use rights" and advised each property owner to "set up an appointment . . . to review [the owner's] particular situation"; (2) even if Ordinance 918 authorized the Town to require the demolition of Little Elm's buildings (a fact that was in dispute based on the various witnesses' understandings of that ordinance at trial),[15] the Town had not actually sought to apply Ordinance 918, and certainly had not made a final decision to apply Ordinance 918, to Little Elm's buildings or any other buildings in that manner at the time of the condemnation (or at the time of the trial); (3) Baldwin conceded that Taylor told him that the Town would not require Little Elm's property "to come into full compliance," but Baldwin said that he "disregarded" Taylor's statement; and (4) the evidence from Little Elm's witnesses at the pretrial hearing established that on the date of the condemnation, it was "reasonably

---

[14]Hawkins admitted that statements by the Town's officials, such as those in Taylor's letter, could not have bound the Town to any position concerning Little Elm's property.

[15]The State contends that Ordinance 918 did not require demolition of Little Elm's buildings because the ordinance, by its language, applied to condemnations that caused a property or improvements to be in violation of the Town's zoning ordinances, while Little Elm's property was already in violation of the ordinances before the State's condemnation.

27

foreseeable" that the Town would pass another ordinance by which property owners could seek variances from the Town's requirements with respect to Ordinance 918, and Little Elm did not present evidence that it could not seek or would not be able to obtain such a variance. Thus, because Baldwin's opinion about the allegedly required demolition of Little Elm's buildings was speculative and conjectural, we hold that the trial court abused its discretion by admitting this testimony. *See Zwahr*, 88 S.W.3d at 629; *Schmidt*, 867 S.W.2d at 773; *Coble*, 134 S.W.3d at 454–58.

There is a sound reason why such speculative testimony should be inadmissible. To the extent that a jury bases its remainder damages decision on a speculative, future injury to be incurred by the landowner and the injury does not eventually occur, the landowner will have received a windfall, which contravenes the purpose of awarding just compensation in condemnation proceedings. *See Zwahr*, 88 S.W.3d at 628 ("[T]he objective of the judicial process in the condemnation context is to make the landowner whole."); *see also United States v. Twin City Power Co.*, 350 U.S. 222, 228, 76 S. Ct. 259, 262 (1956) (explaining that a landowner is to receive "no more than indemnity for his loss").

For an error in the trial court to result in reversal of the trial court's judgment, the record must establish that the error probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH*

28

*Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). If erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. We examine the entire record in making this determination of harm. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g). We evaluate the entire case from voir dire to closing argument, considering the evidence, strengths and weaknesses of the case, and the verdict. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 236 (Tex. 2011). We also consider whether counsel emphasized the erroneous evidence. *Id.*

From voir dire through its final jury argument, Little Elm emphasized its position that the Town would actually require demolition of Little Elm's buildings. For example, in voir dire, Little Elm's counsel told the jury,

> [T]he evidence that we will present to the jury will show that the experts that we will bring before the jury have determined, based upon the [Town's] zoning ordinance, that this piece of property after the taking doesn't comply with the zoning ordinance and cannot be used after the taking as it was used before.
>
> . . . .
>
> . . . Let me just tell you what the landowner's information is going to be and the evidence is going to be, that this property can no longer be used, period.

During Little Elm's opening statement, its counsel stated in part, "[T]his case involves a taking by the State, which triggers a response from the City, which causes the damages that we're going to be talking about with you during the next couple of days." During Little Elm's final jury argument, its counsel said,

29

[T]he land planning expert, Rob Baldwin, told you that full compliance means that these improvements *will be demolished. There's no other way.* There's no way to correct or cure the nonconformities. You can't move the buildings. You can't pick them up and relocate them to get them out of the way. . . . So are the nonconformities going to continue to exist after the taking? According to the Town of Little Elm, they are not. [Emphasis added.]

Baldwin's testimony, coupled with these statements by Little Elm's counsel, encouraged the jury to consider the speculative question of what would actually occur with Little Elm's property after condemnation rather than properly focusing on how uncertainties might have affected the property's market value at the time of the condemnation. *See Schmidt*, 867 S.W.2d at 773. We conclude that there is a reasonable probability that inadmissible evidence that characterized the demolition of Little Elm's buildings as a certainty, rather than a market-affecting factor, improperly influenced the jury's verdict on remainder damages. That verdict, $2,232,913, was not based on the values for remainder damages given by either appraiser, Wright or Hawkins, so it seems likely to us that the jury weighed other considerations. Although part of Hawkins's testimony was the type of testimony that we have held to be generally admissible because that part focused on how the market was affected by a perception or fear that Little Elm would have to demolish its buildings,[16] the jury apparently based its

---

[16]*See Ledrec, Inc.*, 366 S.W.3d at 311 & n.6; *see also Heddin*, 522 S.W.2d at 888. Hawkins testified in the pretrial hearing that he had been an appraiser for twenty-one years, that Ordinance 918 and Taylor's letter would be customarily relied on in the marketplace, and that a market participant would not assign any value to Little Elm's buildings because of the uncertainty of whether the buildings would remain legal. Hawkins opined in the pretrial hearing that "any public

30

verdict, at least in part, on a factor other than (or in addition to) Hawkins's market-based testimony because the jury awarded substantially less remainder damages than the value that Hawkins suggested. We hold that the trial court's erroneous admission of Baldwin's speculative testimony probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). We sustain the State's first issue to the extent of holding that the trial court abused its discretion by admitting the part of Baldwin's testimony described above.

**The exclusion of the State's evidence concerning remainder damages**

In its second issue, the State asserts that the trial court erred by excluding part of the evidence that the State sought to offer on remainder damages.[17] Specifically, the State contends that the trial court erred by excluding evidence relating to Wright's Scenario 2 appraisal, which proposed using the residential part of Little Elm's property to cure the parking spaces that were lost through the

official can change property values by simply announcing something to the market, . . . whether they are authorized to do it or not." Similarly, Hawkins partly offered market-based testimony at trial concerning the effects of Taylor's letter and Ordinance 918. Because we are sustaining the State's first issue based on the trial court's erroneous admission of Baldwin's speculative testimony, we decline to address whether all aspects of Hawkins's testimony were admissible. *See* Tex. R. App. P. 47.1.

[17]Our decision to sustain the State's first issue requires us to reverse the trial court's judgment and remand this case for a new trial. *See Hiroms v. Scheffey*, 76 S.W.3d 486, 488 (Tex. App.—Houston [14th Dist.] 2002, no pet.). But because some of the other issues raised by the parties are likely to arise again upon retrial, we will address them in the interest of judicial economy. *See Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex. 1997).

condemnation, and by excluding testimony from Duane Hutson, the State's expert who developed the land plan leading to that proposal.

Scenario 1 of Wright's report, upon which Wright based his testimony at trial, calculated remainder damages based on an assumption that the part of Little Elm's property that was zoned residential on the date of the taking could not be used for parking spaces. Scenario 2 calculated remainder damages based on an assumption that the residential portion could be rezoned and could be used to replace the parking lost through the condemnation. During a pretrial hearing, Little Elm argued that evidence concerning Scenario 2 should be excluded because, in part, Scenario 2 assumed "that the site, which is owned by the partnership of Little Elm Properties, would be taken without cost, without remuneration, and used as a parking lot at zero." Little Elm contended that the use of the residential portion of its property could not offset the remainder damages that it had incurred with respect to its commercial property.

During the pretrial hearing, Wright testified that Little Elm bought the property at issue in 2004. Wright explained that the far northeastern part of the property, comprising about 11,200 square feet, was residentially zoned, while the rest of the property was zoned for light commercial use. Wright testified that he had considered "market evidence" demonstrating a reasonable probability that the residential part of the property could be rezoned for commercial use, and he alluded to a property across the street from Little Elm's property that had been rezoned from residential to commercial use. Wright noted that Little Elm's

32

appraisers had considered all of Little Elm's property as being commercially zoned.

When the State asked Wright why he opined about remainder damages under two scenarios, he said,

> When we were researching this property, we did observe that the property had a split zoning on it. And while we did have market evidence that showed it was reasonably probable that a zoning change could be initiated on a residential tract to use it for a commercial use, it wasn't something that was factually in existence as of the date of value.
>
> And so from an appraisal experience, even though we knew it was reasonably probable, there was a slight chance that it may not be allowed to be used for a commercial use. And so I prepared two appraisals, one that . . . considered using that commercial lot, which would have been reasonably probable. And then I looked at it under the assumption you couldn't get a rezoning on that residentially-zoned portion of the property.

Wright testified that the methodology of considering two scenarios was appropriate because the scenarios matched "how a market participant would have to look at the property."

Relying in part on an opinion from the supreme court and on one of our opinions, the State argues that the trial court erred by excluding evidence about Wright's Scenario 2 appraisal. *See City of Austin v. Cannizzo*, 153 Tex. 324, 333, 267 S.W.2d 808, 814 (1954); *Calvert v. City of Denton*, 375 S.W.2d 522, 524–25 (Tex. Civ. App.—Fort Worth 1964, writ ref'd n.r.e.). In *Cannizzo*, the supreme court considered whether 4.57 acres that the City of Austin condemned could be valued as commercial property "in the face of contrary zoning

33

restrictions." 153 Tex. at 332, 267 S.W.2d at 814. The court held that the property could be valued as commercial property, explaining in part,

> In the willing seller-willing buyer test of market value it is frequently said that all factors should be considered which would reasonably be given weight in negotiations between a seller and a buyer. This would exclude consideration of purely speculative uses to which the property might be adaptable but wholly unavailable but would permit consideration of all uses to which the property was reasonably adaptable and for which it was, or in reasonable probability would become, available within a reasonable time.

*Id.* at 332–33, 267 S.W.2d at 814 (citation omitted). The court explained that to "warrant admission of testimony as to the value of land for purposes other than that to which it is being put at the time of the taking," the evidence must show that the property is adaptable to the other use, that the other use is reasonably probable within a reasonable time, and that the market value of the land "has been enhanced thereby." *Id.* at 333, 267 S.W.2d at 814; *see Coble*, 134 S.W.3d at 456 (citing and quoting *Cannizzo*).

In *Calvert*, the landowners owned a lot which the City of Denton partially condemned to obtain an easement. 375 S.W.2d at 523. The landowners also owned four contiguous lots of which the city did not condemn any part. *Id.* The issue that we resolved concerned whether remainder damages would be based on the loss of market value on the one partially condemned lot or also on the four uncondemned lots, which could have been combined with the condemned lot to develop a shopping center. *Id.* at 523–24. In holding that the trial court had

34

erred by limiting remainder damages only to the lot subject to condemnation, we

explained in part,

> [V]alue may reflect not only the use to which the property is presently devoted but also to that use to which it may readily be converted.
>
> The record in this case reflects no legal impediments which would prevent the appellants from . . . clear[ing] the property for conversion to use as a shopping center or other business purpose. . . .
>
> . . . .
>
> In *City of Tyler v. Ginn*,[18] . . . the court held:  'There seems to be no question but that *appellees are entitled to the highest value for which the property is adaptable*.'
>
> . . . .
>
> It would appear illogical to say that because four of the lots are occupied by single family houses rented to separate tenants and the fifth lot is devoted to a business use that they should not be treated as a single unit.  Such a holding would be in violent conflict with the *general rule that compensation to the owner is to be estimated by reference to its highest and best use* and not necessarily to its use at the time of condemnation.
>
> . . . .
>
> It is agreed that only by treating the five lots in question as a single tract can the property be devoted to its highest and best use and that treated as such it has sustained damages in addition to those allowed.

*Id.* at 525–27 (emphasis added); *Bauer v. Lavaca-Navidad River Auth.*, 704

S.W.2d 107, 109 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.) ("The owner

---

[18]225 S.W.2d 997, 998 (Tex. Civ. App.—Texarkana 1949), *writ dism'd*, 148 Tex. 604, 227 S.W.2d 1022 (1950).

35

of the condemned land is entitled to have the fact finder consider, in determining its fair market value, the highest and best use to which the land is adaptable."); *see also City of Sugar Land v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 511 (Tex. App.—Eastland 2007, pet. denied) (stating that one of the factors to be used in determining the highest and best use is "maximal productivity").

In the pretrial hearing, as one ground for excluding evidence about Wright's Scenario 2 appraisal, Little Elm argued, "The [residential] lot, which [Wright] compares to the office building on the same size lot across the street, cannot be used after the taking and his scenario cannot be adopted to any other use but parking. That is a permanent damage to the [residential] lot . . . ." Similarly, on appeal, Little Elm argues that Wright failed to "analyze the maximally productive use of the existing residential tract."

In his pretrial testimony, Wright conceded that if the residential part of Little Elm's property was rezoned for commercial use and a parking lot was placed on it, it could not thereafter be used to contain a commercial building. He also stated in his testimony before and during the trial that as vacant, the highest and best use of all of Little Elm's property would be for "future commercial development or holding for investment." But the State did not provide evidence, either in the pretrial hearing or in the bill of exception on Wright's testimony that the State made at trial, to substantiate that the highest and best use of Little Elm's residential property, if rezoned for commercial use, would be to merely add parking spaces rather than to pursue other types of commercial development.

36

Wright did not explain why using the property for a parking lot would be maximally productive when it could be used to, for instance, host another business that could pay rent to Little Elm. Wright and Hutson each admitted during the pretrial hearing that the residential tract was big enough to contain a commercial building. At trial, Wright conceded that commercial buildings may provide "ample income that's well above the value of the land."

Based on the principles explained above, we hold that the trial court did not abuse its discretion by excluding evidence about Wright's Scenario 2 appraisal, through testimony from Wright or Hutson, because the State did not establish that placing a parking lot on Little Elm's residential property was that property's highest and best use or that, alternatively, Little Elm would be compensated for damages based on the change of the residential property's highest and best use to a lesser use.[19] *See Calvert*, 375 S.W.2d at 525–27; *Ginn*, 225 S.W.2d at 998; *see also Cont'l Dev. Corp. v. State*, 337 S.W.2d 371, 374 (Tex. Civ. App.—Fort Worth 1960, no writ) (holding that a trial court did not abuse its discretion by excluding a landowner's evidence of a possible zoning change from residential to commercial property because the landowner did not present evidence that a commercial use would be the property's highest and best use). We overrule the State's second issue.

_____

[19]In contrast, in Wright's Scenario 1 appraisal, which proposed the partial demolition of a building on Little Elm's property, Wright included $915,979 in permanent damages based on a reduction of "some of the income that could be generated by th[e] property."

**The exclusion of evidence about Ordinance 954 and Baldwin's site plan**

In its third issue, the State asserts that the trial court abused its discretion by excluding evidence concerning Ordinance 954 and the Town's approval of Baldwin's conceptual site plan. Little Elm contends that the trial court's decision to exclude this evidence was proper because the Town's passing Ordinance 954 and approving Baldwin's site plan occurred after the date of the condemnation. Before trial, the State argued that Baldwin's site plan should have been admissible as rebuttal evidence to Baldwin's opinion that Little Elm's buildings required demolition.

Ordinance 954 allowed landowners who received compensation from eminent domain actions to request variances from the Town's ordinances. Baldwin's conceptual site plan proposed replacing the parking spaces lost in the condemnation and did not require demolishing all of Little Elm's buildings.

Compensation for land taken by eminent domain must be measured by circumstances that may have affected the market value of the land, meaning the perceptions of willing buyers and sellers, at the time of the taking. *Zwahr*, 88 S.W.3d at 627; *Heddin*, 522 S.W.2d at 888. Thus, evidence of events occurring after the date of the taking must generally be excluded because those events could not have affected an antecedent market value. *See Heddin*, 522 S.W.2d at 889 ("A rupture occurring subsequent to the date of taking could not have had an effect on market value as of the date of taking."); *Sw. Pub. Serv. Co. v. Vanderburg*, 526 S.W.2d 692, 694 (Tex. Civ. App.—Amarillo 1975, no writ)

(explaining that testimony should not have been admitted because it concerned an incident that occurred "after the date of taking, and thus, could not have influenced market value on the date of taking"). Evidence of events occurring after the taking may be admissible, however, for rebuttal "under certain limited circumstances and for a properly limited purpose." *Heddin*, 522 S.W.2d at 889 (holding that if a landowner produced evidence that the potential of a pipeline rupture could affect market value on the date of the taking and the condemnor asserted that the pipeline was free from danger, the landowner could offer rebuttal evidence of pipeline ruptures occurring after the date of the taking); *see Stinson v. Arkla Energy Res.*, 823 S.W.2d 770, 772 (Tex. App.—Texarkana 1992, no writ) ("A trial court may allow otherwise inadmissible evidence to rebut testimony.").

Under *Heddin*, because the passing of Ordinance 954 and the approval of Baldwin's site plan occurred after the date of the taking, we conclude that the trial court did not abuse its discretion by excluding evidence about the particular language of Ordinance 954[20] and the approval of the site plan to the extent that

---

[20]The trial court admitted testimony that on the date of the taking, it was foreseeable that the Town would pass a curative ordinance, but the court excluded evidence about the specific language of Ordinance 954. The State has not directed us to any evidence in the record establishing that Ordinance 954's specific language had been drafted in final form and was reasonably foreseeable to be passed on the date of the taking. Thus, we conclude that the trial court did not abuse its discretion by excluding evidence about the particular language of Ordinance 954 to the extent that the State offered that evidence as a factor affecting market value. *See Heddin*, 522 S.W.2d at 889.

39

this evidence was offered by the State "as a factor affecting market value." *See Heddin*, 522 S.W.2d at 889. But because the trial court erroneously admitted Baldwin's speculative testimony that Little Elm would actually be required to demolish all of its buildings, we conclude that the trial court abused its discretion to the extent that the court precluded the State's ability to rebut Baldwin's testimony by introducing evidence showing that the demolition of the buildings was not certain. *See id.* We sustain the State's third issue to that extent. For reasons similar to those stated in our analysis of the State's first issue and because the trial court's ruling left the jury with an incomplete picture of whether Little Elm's buildings would actually have to be demolished, we hold that the State suffered harm as a result of the exclusion of its rebuttal evidence. *See* Tex. R. App. P. 44.1(a).[21]

**The reliability of Wright's testimony**

In its fourth cross-issue, Little Elm contends that the trial court erred by denying its motion to exclude Wright's testimony on the basis that it was unreliable. Specifically, Little Elm contends that Wright's opinions were unreliable because he used two scenarios that contained different remainder damage values. Little Elm asserts that "[t]his sequence of events required Little

---

[21]Because evidence concerning the specific language of Ordinance 954 and Baldwin's conceptual site plan were admissible only as rebuttal evidence under the circumstances of the first trial, we cannot opine about whether this evidence will be admissible upon retrial.

40

Elm . . . to prepare for trial in anticipation of Mr. Wright's testimony on multiple reports."

Wright said that he provided two scenarios of remainder damages because he was "trying to articulate some . . . different approaches that would likely happen" depending on whether the residential portion of Little Elm's property could be used commercially. Wright concluded that both of his scenarios, which were independent of each other and were supported by separate reports, were reliable and supported by appraisal methodology used in his profession.

We have held above that the trial court did not abuse its discretion by excluding evidence concerning Wright's Scenario 2 appraisal. We cannot reasonably anticipate whether the State will again offer multiple appraisal scenarios upon retrial as it did in the first trial. For that reason, and because resolution of Little Elm's fourth cross-issue is unnecessary to reach a final disposition of this appeal,[22] we decline to address this cross-issue. *See* Tex. R. App. P. 47.1; *Dickinson v. Dickinson*, 324 S.W.3d 653, 659 n.2 (Tex. App.—Fort Worth 2010, no pet.).

---

[22]Little Elm asks us to reverse the trial court's judgment and render judgment in its favor in the amount of $4,075,000. Little Elm does not cite authority, however, that would authorize us to render judgment based on the evidentiary issues that it has presented. *See TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 233, 245 (Tex. 2010) (remanding a case for a new trial based on the improper and harmful admission of evidence).

41

**Discovery Issues**

In its first three cross-issues, Little Elm contends that the trial court erred by allowing the State to present certain evidence because the State failed to comply with various rules of civil procedure, including rules related to discovery. Specifically, in its first cross-issue, Little Elm argues that the trial court erred by allowing the State to call witnesses whom the State had not indicated, through answering an interrogatory, that it expected to call at trial. In its second cross-issue, Little Elm asserts that the trial court erred by permitting Wright to testify because Wright relied on the opinion of an undisclosed expert. In its third cross-issue, Little Elm contends that the trial court erred by allowing Wright to testify because the State failed to timely submit his work file. The State responds to these cross-issues by arguing, in part, that the trial court did not err by determining that Little Elm was not unfairly surprised or prejudiced by the State's alleged procedural errors.

The trial court signed an agreed scheduling order in November 2009. The order set a deadline of January 22, 2010 for the parties to designate experts and to "provide materials regarding those experts." On January 25, 2010, through signed letters, the parties agreed to give each other more time to designate experts. On February 2, 2010, Little Elm agreed to accept the State's expert designation that it had mailed a day earlier. The State's February 2010 expert designation, which was included within a response to a request for disclosure, designated Wright as an expert on value, stated that Wright's report had "not

42

been completed," and expressed that the State could supplement its designation under rule of civil procedure 193.5. In its February 2010 motion for summary judgment, Little Elm contended that the State's expert designation had "failed to provide the expert's mental impressions and opinions" and that in the designation, the State had failed to produce the expert's work file.

In March 2010, the State filed a motion for continuance, contending that it had recently received new lead counsel from the Attorney General's office, that Wright was in the process of finishing his report, and that the State had recently hired a second expert, Hutson. Little Elm opposed the State's motion for continuance. After holding a hearing, the trial court granted the State's motion and signed a new scheduling order providing that the State had until April 12, 2010 to designate Wright and Hutson and to provide those experts' materials; that Little Elm had until May 12, 2010 to designate any rebuttal experts; and that the parties had until July 30, 2010 to complete discovery. The State designated Wright and Hutson as experts and produced their reports by April 12, 2010 but did not provide their work files by that date. Instead, on April 12, 2010, the State supplemented its response to Little Elm's request for disclosure and stated, "Mr. Wright's and Mr. Hutson's work files will be made available upon request for inspection at a reasonable time and place by agreement of the parties." The State delivered its experts' work files to Little Elm shortly after Little Elm requested the files in July 2010.

On August 20, 2010, the State filed a motion for leave to file a late expert designation. In addition to Wright and Hutson, the State wanted to designate Taylor as an expert witness because Taylor had testified in a deposition that Little Elm's improvements would retain their nonconforming status after the State's taking.

In September 2010, Little Elm filed motions to exclude testimony from the State's proposed expert witnesses (Wright, Hutson, and Taylor). In the motions, Little Elm contended that although the State had timely designated Wright and Hutson as experts, the State had failed to timely produce their work files.[23] Little Elm also contended that Taylor should not be allowed to testify as an expert because he was not timely designated. The State responded by contending that Little Elm was not surprised or prejudiced by the materials in Wright's and Hutson's work files, that the files had been produced within a reasonable time after Little Elm requested them, and that Taylor would be an appropriate expert witness because Little Elm's experts had consulted with him and because Little Elm could therefore not be surprised by the opinions that he would offer.

Before trial, the trial court excluded Taylor from being an expert witness but allowed him to testify as a fact witness. The court also denied Little Elm's motions to exclude the State's experts' testimony based on discovery violations.

---

[23]See Tex. R. Civ. P. 194.2(f)(4)(A), 194.4.

While the court acknowledged that the State had failed to comply with discovery rules, it reasoned,

> I don't believe that . . . Little Elm Plaza . . . has been so fundamentally disadvantaged by discovery violations that have occurred that it justifies not trying the case on the merits. I don't believe we've reached that threshold in this case . . . .
>
> Ultimately, the discovery has been achieved. . . .
>
> . . . I want to try this case on the merits. And having heard what I've heard, I don't believe . . . that the discovery violations which have occurred have risen to the level necessary to strike these experts' [opinions].

A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, unless the court finds that

> (1) there was good cause for the failure to timely disclose or (2) the failure will not unfairly surprise or prejudice the other parties. The purposes of this rule are to promote responsible assessment of settlement and prevent trial by ambush. The party seeking to offer the evidence at issue has the burden to establish good cause or lack of unfair surprise or prejudice. The trial court has discretion to determine whether the offering party has met its burden; however, a finding of good cause or the lack of unfair surprise or unfair prejudice must be supported by the record.

*O'Dell v. Wright*, 320 S.W.3d 505, 511 (Tex. App.—Fort Worth 2010, pet. denied) (citations omitted); *see* Tex. R. Civ. P. 193.6. We review a trial court's finding that a party was not unfairly surprised or prejudiced by a discovery violation under an abuse of discretion standard. *See Tex. Mun. League Intergovernmental Risk Pool v. Burns*, 209 S.W.3d 806, 818 (Tex. App.—Fort

Worth 2006, no pet.); *Commercial Structures & Interiors, Inc. v. Liberty Educ. Ministries, Inc.*, 192 S.W.3d 827, 832 (Tex. App.—Fort Worth 2006, no pet.).

Little Elm claims in its first cross-issue that Wright and Taylor should not have been allowed to testify because the State failed to list them as witnesses while responding to Little Elm's interrogatories. The State has asserted, without contradiction by Little Elm, that each party had named Taylor as a person with knowledge of relevant facts, that Taylor was deposed by the parties, and that Little Elm's experts referenced Taylor in their reports. Through responding to a request for disclosure months before trial, the State designated Wright as a "testifying expert," and Little Elm later took Wright's deposition. Also, months before trial, the trial court held a hearing that specifically regarded the State's intention for Wright to testify, and shortly after that, the State provided Wright's appraisal report to Little Elm. Thus, we conclude that the trial court did not abuse its discretion by concluding that Little Elm was not prejudiced or surprised by Wright's or Taylor's testimony although they were not named by the State as trial witnesses in response to Little Elm's interrogatory, and we overrule Little Elm's first cross-issue.

Next, Little Elm contends that the trial court should have excluded Wright's testimony because he relied on the undesignated expert opinion of Robert Brown, the Town's attorney, and Little Elm learned of this reliance only a week before trial. *See* Tex. R. Civ. 192.3(e) (stating that parties may discover information concerning consulting experts whose mental impressions or opinions

46

have been reviewed by a testifying expert). The evidence in the pretrial hearing established that Wright had spoken with Brown about the Town's plans with respect to Little Elm's property, that Brown had told Wright that the Town did not intend to make property owners cure all of the preexisting nonconformities on their property, and that Wright had considered Brown's opinion. But Wright denied that he relied on a May 2009 letter that Brown had written concerning that issue, and Wright testified that he did not consider Brown to be a consulting expert. Wright acknowledged that he did not discuss his conversations with Brown in his appraisal reports, but he said that there was nothing that required him to "cite everyone that [he] talked to."

Even if the State should have designated Brown as a consulting expert, Brown's opinion about the effect of the Town's ordinances (that Little Elm's buildings were grandfathered and would not need to be demolished) was not substantively different than the opinions that Wright and Taylor had expressed to Little Elm long before the trial began. The record does not indicate that Wright's opinion changed from one position to another as a result of conferring with Brown; instead, it indicates that Brown provided support for an opinion that Wright would have likely reached based on other facts that he had considered and other people that he had talked to. Wright testified that his "ultimate conclusion" centered on the Town's ordinances because the ordinances "are what the city administrators are supposed to go by." Also, Little Elm knew two months before trial that Brown, through a letter, had expressed opinions about

47

the effects of the Town's ordinances. Although Little Elm claims in its brief that it was not afforded the opportunity to take Brown's deposition, Little Elm does not direct us to any point in the record when it asked the trial court to grant that opportunity, to allow for a continuance so that a deposition could occur, or to allow discovery related to Brown's opinions about the Town's ordinances after obtaining knowledge of his letter. Finally, at trial, the trial court excluded references to Brown's opinion about the effect of the Town's ordinances. Based on all of these facts, we hold that the trial court did not abuse its discretion by determining that Little Elm had not suffered undue surprise or prejudice based on the fact that the State did not designate Brown as a consulting expert, and we overrule Little Elm's second cross-issue. *See O'Dell*, 320 S.W.3d at 511; *Burns*, 209 S.W.3d at 818.

Finally, in its third cross-issue, Little Elm contends that the trial court erred by allowing Wright to testify because although the State timely designated him as an expert and timely delivered his report, the State failed to timely deliver his work file. Concerning prejudice or unfair surprise resulting from the allegedly untimely delivery of Wright's work file, Little Elm contends in its brief only that it was unable to "designate any rebuttal witnesses to the State's experts." But Little Elm does not contend that it asked the State or the trial court to grant a late designation of rebuttal witnesses or that either the State or the trial court denied such a request. Also, on appeal, Little Elm has failed to specify any information contained in Wright's work file that it desired to rebut or was unable

to rebut.  Furthermore, the record establishes that Little Elm received the work file two months before the trial began and several weeks before Little Elm deposed Wright.  Thus, we hold that the trial court did not abuse its discretion by determining that Little Elm was not unfairly surprised or prejudiced by the allegedly late delivery of Wright's work file.  *See O'Dell*, 320 S.W.3d at 511; *Burns*, 209 S.W.3d at 818.  We therefore overrule Little Elm's third cross-issue.

## Evidentiary Sufficiency

In the State's fourth issue, it contends that the evidence is insufficient to support the jury's verdict of remainder damages in the amount of $2,232,913. Because our disposition of other issues requires us to reverse the trial court's judgment and remand this case for a new trial and because a new trial is the only relief that the State has requested, we decline to address whether the evidence in the previous trial was sufficient to sustain the jury's verdict.  *See* Tex. R. App. P. 47.1; *Dickinson*, 324 S.W.3d at 659 n.2.

## Conclusion

Having sustained the State's first and third issues, which are dispositive, we reverse the trial court's judgment and remand this case for a new trial.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

WALKER, J., concurs without opinion.

DELIVERED:  October 25, 2012